**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 00-20781**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**WILLIAM DOUGLAS ROBERTS,**

**Defendant-Appellant.**

**Appeal from the United States District Court
for the Southern District of Texas**

December 4, 2001

Before HIGGINBOTHAM, BARKSDALE, and STEWART, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Our analysis turns on whether the Fourth Amendment permits a non-routine, outbound search at the functional equivalent of the border, when Customs Agents reasonably suspect a traveler is smuggling contraband. William Douglas Roberts, convicted of possession and interstate transportation of child pornography, appeals the denial of his motion to suppress, claiming that diskettes containing child pornography seized during a warrantless search of his personal effects at an airport as he was departing the United States were obtained in violation of the Fourth Amendment. **AFFIRMED.**

On 7 July 1998, the Customs Service Resident Agent in Charge for Lake Charles, Louisiana (RAC-Lake Charles), contacted Customs Senior Special Agent Coffman and informed him: (1) a William Roberts would be flying that day non-stop from Houston's Bush Intercontinental Airport (IAH) to Paris; (2) when he traveled, he typically carried a computer and diskettes containing child pornography; and (3) he usually carried the diskettes in a shaving kit. Agent Coffman relayed this information to Customs Special Agent Rios, and those two Agents proceeded to IAH. Roberts, however, did not board a flight that day.

Approximately seven weeks later, on 24 August, another Agent with RAC-Lake Charles notified Agent Rios that, the next day, Roberts would fly from Louisiana to Houston and take an international flight. RAC-Lake Charles also provided Roberts' photograph. The next morning, 25 August, an Officer with the Sheriff's Office for Natchitoches Parish, Louisiana, informed Agent Rios that Roberts was suspected of traveling with child pornography on diskettes that would be packed in a shaving kit; this conformed with the information provided by the RAC-Lake Charles on 7 July. Upon receiving this information, Agent Rios and Special Agent Stewart met Agent Coffman at IAH.

Agent Rios provided the information to Agent Coffman, and the Agents checked a computer database, verifying that Roberts was booked on a direct flight to Paris (Paris-flight). Agent Rios

showed Roberts' photograph to Agent Coffman and informed him that Roberts would be arriving on a flight from Louisiana at 12:18 p.m. Agent Coffman watched the passengers disembark the flight from Louisiana and, using the photograph, identified Roberts and noted his clothing.

Agent Coffman then proceeded to organize an outbound inspection of the Paris-flight. He informed the inspection group that Roberts would be carrying diskettes containing child pornography in a shaving kit and described Roberts' clothing.

The Agents established the outbound inspection in the jetway to the Paris-flight. As Roberts entered the jetway, Agent Coffman identified him and directed him to a search table. Customs Inspector Hanson asked Roberts: (1) if he possessed more than $10,000 in currency he wanted to declare; and (2) to open his bags. Roberts opened his luggage and the Inspector found a shaving kit. The Inspector opened the kit and discovered six diskettes matching the information the Agents had received. Inspector Hanson asked Roberts what the diskettes contained, but Roberts gave no specific response.

Agent Coffman identified himself and took over the interview. He told Roberts he was with Customs and was looking for currency or the exportation of high technology *or other data prohibited by law*. Agent Coffman asked Roberts whether he was carrying anything that

did not belong to him.  Roberts indicated he was not.[1]  Agent Coffman told Roberts the Agents would have to search the diskettes to ensure they could be carried out of the country legally.  The Agent offered Roberts the choice of either: continuing on the Paris-flight, leaving the diskettes behind to be searched and mailed to him; or remaining at the airport while the diskettes were searched and departing on a later flight.  Roberts indicated he would wait.

Agents Coffman, Rios, and Stewart, and Inspector Hanson escorted Roberts to a secondary inspection area.  Agent Coffman opened Roberts' laptop computer and told Roberts he needed to scan the material on it.  Agent Coffman also asked Roberts if he could describe what the diskettes contained.  Roberts responded that he wanted to cooperate but asked to speak privately with Agent Coffman.  Agent Coffman escorted him to an interview room.

There, Roberts told Agent Coffman "he was embarrassed that there was some child pornography on the diskettes and he didn't want everybody to see it".  Agent Coffman asked, "What do you mean child pornography, like the teen stuff on the internet...?"  Roberts replied, "No, young kids", followed by "six", which Agent Coffman understood to mean the diskettes contained images of six-year-old children.  Agent Coffman then left the room and told Agent

---

[1]"Indicated" appears in this opinion only to the extent it was used in testimony.

4

Rios that Roberts had stated the diskettes contained child pornography.

Agents Coffman and Rios presented Roberts a waiver form stating his *Miranda* rights. Roberts initialed each right and signed the waiver portion of the form. Agent Coffman informed Roberts it is illegal to possess and transport child pornography out of the country. When asked where he had obtained the pornography, Roberts responded: he had downloaded it from internet sites and chat rooms; he had not paid for it; and it was for personal use and not resale.

Shortly thereafter, Agent Coffman presented, and Roberts signed, a consent-to-search form, authorizing a complete search of his luggage, computer, and diskettes. The form also provided: "Agents are authorized by me to take any letters, papers, materials, or other property which they may desire to examine". The Agents signed a "Custody receipt for Retained or Seized Property", which listed the items seized from Roberts. Roberts signed the portion of the form titled "Notice of Abandonment and Assent to Forfeiture".

In accordance with Customs procedure, the Agents provided Roberts a blank form on which to make a written statement, if he so chose. They left Roberts alone, and he provided a four-page handwritten statement. Agent Rios and another Agent then finished the interview.

5

Agent Coffman testified at trial he believed another Agent turned on Roberts' computer that day and confirmed the presence of pornographic materials.  The Agents did not, however, search the diskettes that day.  The computer and diskettes were sent to a forensic agent for an examination; it revealed more than 5,000 graphic images, mostly depicting teens and pre-teens engaged in sexually explicit conduct.

On 20 July 1999, approximately 11 months after the search, the Agents executed an arrest warrant on Roberts at IAH.  Agent Rios advised Roberts of his *Miranda* rights, and Roberts waived them in writing.  Roberts admitted he knew the diskettes seized on 25 August 1998 contained child pornography; stated he had downloaded it from the internet; and denied having taken the photographs.

That August, Roberts was indicted on two counts for knowingly possessing and transporting, in interstate commerce, child pornography, in violation of 18 U.S.C. §§ 2252A(a)(1), 2252A(a)(5)(b), and 2256(8)(A).  Roberts moved to suppress: (1) on Fourth Amendment grounds, the evidence seized in the searches; and (2) the statements he made on that date, as "fruit of the poisonous tree".

Through a comprehensive and insightful opinion analyzing the constitutionality *vel non* of routine and non-routine outbound border searches, the district court held, *inter alia*: (1) the initial stop and luggage search in the jetway, as well as escorting

Roberts to the secondary search area, were permissible as a *routine* border search; (2) Roberts consented to the search of his computer and diskettes; and (3) even absent consent, the search of the computer and diskettes would have been valid as a routine border search. *United States v. Roberts*, 86 F. Supp. 2d 678, 687-89 (S.D. Tex. 2000). Regarding Roberts' statements, the district court held: (1) they were not "fruit of the poisonous tree", as there was no earlier Fourth Amendment violation; (2) they were not coerced; and (3) they were not subject to suppression under *Miranda v. Arizona*, 384 U.S. 436 (1966). *Roberts*, 86 F. Supp. 2d at 689-90.

In a subsequent bench trial, Roberts was convicted on both counts. He was sentenced to 51 months imprisonment and three years supervised release.

## II.

The underlying facts are essentially undisputed. Disputed questions of law concerning a suppression ruling are reviewed *de novo*, including whether there was reasonable suspicion for the search. *See United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999). The denial "should be upheld 'if there is any reasonable view of the evidence to support it'". *Id.* (quoting *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993)).

### A.

The Fourth Amendment provides in part: "The right of the people to be secure in their persons ... and effects, against

unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...."  As a result, "warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions".  *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993), *cert. denied*, 511 U.S. 1134 (1994).

1.

One exception is for border searches; Agents may conduct a "routine" search — one that does not "seriously invade a traveler's privacy", *id.* at 1148 n.3 — "at the international border *or its functional equivalent* without probable cause, a warrant, or any suspicion to justify the search".  *United States v. Rivas*, 157 F.3d 364, 367 (5th Cir. 1998) (emphasis added).  The parties agree the initial jetway search occurred at the functional equivalent of the border but disagree on whether that search was "routine".

Citing *United States v. Berisha*, 925 F.2d 791 (5th Cir. 1991), Roberts contends:  an *outbound* border search may qualify as routine only if the search is incident to some substantial national interest, *e.g.,* a search for currency; and, in the alternative, a seizure of computer equipment cannot be routine because of its intrusiveness on a traveler's privacy.  The Government counters: the jetway search involved a routine search for currency and technology; an additional subjective motive to search for child pornography did not render it non-routine; and a limited search and

8

seizure of a person and his effects, including a computer, is routine for purposes of the border search exception.

For obvious reasons, constitutional issues should be decided on the most narrow, limited basis. *See, e.g.*, **Dallas Joint Stock Land Bank v. Davis**, 83 F.2d 322, 323 (5th Cir. 1936) ("[I]t is a settled rule in the federal courts that questions of constitutional law ... will be decided only where a present necessity for such decision exists, and then only no more broadly than the precise situation in question requires".); *see also* **Liverpool, N.Y. & Philadelphia S.S. Co. v. Comm'rs of Emigration**, 113 U.S. 33, 39 (1885) (admonishing "never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied"); **Staub v. City of Baxley**, 355 U.S. 313, 330 (1958) (Frankfurter, J., dissenting) (noting Supreme Court practice of "keeping constitutional adjudication, when unavoidable, as narrow as circumstances will permit"). Accordingly, if possible, the issue of whether the jetway search was "routine" should be avoided.

On this record, it is possible to do so. Assuming the search was not routine, it is well established that, for inbound traffic, Customs Agents may conduct "non-routine" searches at the border or its functional equivalent provided they reasonably suspect the traveler is smuggling contraband. *See* **Cardenas**, 9 F.3d at 1148

n.3.  It is on this more narrow constitutional basis that, for this outbound traffic, the suppression ruling can be affirmed.[2]

2.

To date, our court's non-routine border search jurisprudence has involved only *inbound* searches.  While cases involving arguably non-routine *outbound* searches have arisen in our circuit, they have been resolved on grounds alternative to the border search exception.  *See, e.g.*, **Samora v. United States**, 406 F.2d 1095, 1099 (5th Cir. 1969) (finding probable cause and stating "[w]e need not consider other grounds on which the government claims the search was valid").  In **Berisha**, 925 F.2d at 795, our court extended the border search exception to *routine* outbound searches conducted

---

[2]Even Roberts seems to agree with the Government on the constitutionality of this more narrow exception.  In any event, this issue was raised in district court.  Roberts, of course, maintains reasonable suspicion is lacking.  For this alternative basis for upholding the search, the district court noted:

> *If the border search exception applies to export searches in the same way it applies to searches of persons and property entering the country,* then the agents had the authority to search the defendant's computer and diskettes even if that search would be "nonroutine." The agents needed only a "reasonable suspicion of wrongdoing" to conduct a nonroutine search. They had a reasonable suspicion based on the information they had previously received about the defendant and their corroboration of that information in their preliminary observations and during the routine detention and search in the jetway.

**United States v. Roberts**, 86 F. Supp. 2d 678, 688 n.4 (S.D. Tex. 2000) (emphasis added).

pursuant to a statute authorizing Customs Agents, for purposes of detecting certain currency violations, to "stop and search, at the border and without a search warrant ... any person entering or departing from the United States". 31 U.S.C. § 5317(b).[3]

Our court declined, however, to adopt a blanket rule as to the applicability of our border search jurisprudence to outbound searches generally. *See* **Berisha**, 925 F.2d at 795 n.8. Nevertheless, **Berisha**'s observations regarding the similarities between inbound and outbound searches are pertinent to the constitutionality *vel non* of the search at issue:

> We note that both incoming and outgoing border searches have several features in common; for example, the government is interested in protecting some interest of United States citizens, there is a likelihood of smuggling attempts at the border, and the individual is on notice that his privacy may be invaded when he crosses the border.

*Id.* at 795 (citing **United States v. Stanley**, 545 F.2d 661, 667 (9th Cir. 1976), *cert. denied*, 436 U.S. 917 (1978)).

Perhaps most instructive for the present case is **United States v. Salinas-Garza**, 803 F.2d 834 (5th Cir. 1986), where our court considered whether, pursuant to an earlier version of the statute

---

[3]That section provides: "For purposes of ensuring compliance with the requirements of [31 U.S.C. §] 5316, a customs officer may stop and search, at the border and without a search warrant, any vehicle, vessel, aircraft, or other conveyance, any envelope or other container, and any person entering or departing from the United States". 31 U.S.C. § 5317(b). The referenced § 5316 establishes a reporting requirement for persons transporting out of the country monetary instruments greater than $10,000.

11

involved in **Berisha**, there was the then requisite "reasonable cause" to permit an outbound stop and search for currency. The earlier version authorized a border search only if a Customs Agent "had *reasonable cause* to believe" a person was engaging in certain currency violations. 31 U.S.C. § 5317(b) (1984) (emphasis added). In reviewing the denial of Salinas-Garza's suppression motion, our court observed:

> Some circuits have extended the [border search exception] to persons exiting the country. Such a standard would allow a warrantless search of a person leaving the country without any modicum of suspicion of criminal activity. However, we do not need to decide whether to adopt such a position because *even if* such a border search were constitutionally permissible, Congress can further restrict the search authority of federal agents, and has done so in the context of this case. Thus, it is not the constitutional standard of a border search that regulates the behavior of the custom agents in this case, but a statutory one.

**Salinas-Garza**, 803 F.2d at 836-37 (emphasis added; internal quotations, citations, and footnote omitted).

While our court purported *not* to decide a constitutional issue in **Salinas-Garza**, *id.* at 836 n.4, 837, it implicitly did. The opinion's characterization that Congress "restricted" the search authority of federal agents by imposing the "reasonable cause" standard is only accurate to the extent that the search authority *prior* to such Congressional action required something *less* than reasonable cause. Restated, our court assumed that what Congress

12

restricted was the border search exception itself.  For absent that exception, the applicable standard for the search would have been probable cause — a standard *more* restrictive than the reasonable cause required by the statute.  In short, for outbound border searches, our court acknowledged, by implication, a *constitutional* standard less stringent than probable cause.

As our court noted in **Salinas-Garza**, other circuits have acknowledged the full force of the border search exception for outbound searches. *See, e.g.*, **Stanley**, 545 F.2d at 665-67; **United States v. Ezeiruaku**, 936 F.2d 136, 143 (3d Cir. 1991) ("Accordingly, we ... conclud[e] that the traditional rationale for the border search exception applies as well in the outgoing border search context."); **United States v. Duncan**, 693 F.2d 971, 977 (9th Cir. 1982) ("Since this was a search at a 'border', of a person leaving the country, there is no need for probable cause, warrants or even suspicion."), *cert. denied*, 461 U.S. 961 (1983); **United States v. Ajlouny**, 629 F.2d 830, 834 (2d Cir. 1980) (interpreting Second Circuit law to hold "the border search exception applies to items leaving as well as entering the country"), *cert. denied*, 449 U.S. 1111 (1981).  Even so, as in **Berisha**, it is not necessary on this record to fully extend the border search exception to all outbound searches.[4]

_____

[4]The Supreme Court has suggested — albeit in *dicta* — that such a result is permissible: "[T]hose entering and leaving the country

13

Pursuant to the plain wording of the Fourth Amendment ("right to be secure ... against unreasonable searches and seizures"), "[t]he ultimate standard set forth in the Fourth Amendment is reasonableness". *Cady v. Dombrowski*, 413 U.S. 433, 439 (1973).  In addition, "the Fourth Amendment balance between the interests of the Government and the privacy of the individual is ... struck much more favorably to the Government at the border". *United States v. Montoya de Hernandez*, 473 U.S. 531, 540 (1985).  Accordingly, based on this record, and bringing into play only the most narrow constitutional basis, a non-routine outbound search is permissible when the following factors are present:  (1) the outbound search is at the border or its functional equivalent; (2) Customs Agents have reasonable suspicion that a particular traveler will imminently engage in the felonious transportation of specific contraband in foreign commerce; and (3) the search is relatively unintrusive and only of the area where the contraband is allegedly secreted.  Factors (1) and (3) are satisfied for the initial search at the jetway; factor (2) (reasonable suspicion), as discussed below in part II.B., is as well.

Again, our holding establishes only the most narrow basis for a non-routine outbound search being constitutional.  Expansion, if

_____

may be examined as to their belongings and effects, all without violating the Fourth Amendment...." *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 63 (1974).

14

any, of this holding must await another case.  Obviously, each case will turn on its facts.

B.

"Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person' of smuggling contraband." *Rivas*, 157 F.3d at 367 (quoting **Montoya de Hernandez**, 473 U.S. at 541).  Such suspicion must be based upon "specific facts which, taken together with rational inferences therefrom, reasonably warrant an intrusion".  *Cardenas*, 9 F.3d at 1153.  "In determining whether government agents possessed a reasonable suspicion that criminal activity was occurring, we must consider 'the totality of the particular circumstances.'"  *Rivas*, 157 F.3d at 367 (quoting **Cardenas**, 9 F.3d at 1148).  As stated earlier, each reasonable suspicion case ultimately turns on its own facts.  **United States v. Himmelwright**, 551 F.2d 991, 995 (5th Cir.), *cert. denied*, 434 U.S. 902 (1977).

The facts at hand are not novel.  Almost 25 years ago, in **United States v. Afanador**, 567 F.2d 1325 (5th Cir. 1978), our court reviewed the denial of a motion to suppress cocaine discovered and seized by Customs Agents in the course of a strip search of two flight attendants who had entered the United States.  *Id.* at 1327-28.  Those Agents acted pursuant to a tip from a confidential source with whom the Agents had had no prior contact.  The informant provided the following information: (1) a particular

15

person (defendant Vidal-Garcia); (2) would fly into the country (Miami); (3) from a foreign country (Colombia); (4) on a particular flight (Aerocondor 204); (5) on a particular date (3 January 1977); (6) traveling as a stewardess; (7) carrying a particular type of contraband (cocaine). *Id.* at 1327. Upon the specified flight's arrival, Customs authorities verified Vidal-Garcia had arrived as a stewardess on the specified flight and date. After a primary search of the crew's luggage revealed nothing suspicious, and "[s]olely on the basis of the partially verified confidential tip regarding Vidal-Garcia, customs inspectors were instructed by their supervisor ... to search all six members of the Aerocondor crew". *Id.* In the ensuing strip searches, Agents discovered cocaine on the persons of Vidal-Garcia and another crew member. *Id.* at 1327-28.

In affirming the denial of the motion to suppress as to Vidal-Garcia, our court stated:

> We believe the applicable standard of "reasonable suspicion" is met in a strip search case where the authorities have received information as detailed as that received in this case, *specifying that a named individual traveling in a specified capacity will be body carrying a particular type of contraband on a particular date and flight, where the identifying portion of that information has been verified by the authorities on the flight's arrival*, and where the authorities have no reason to believe the informant is unreliable and have taken affirmative steps to insure that the informant is not being paid for the information and has no criminal record.

16

*Id.* at 1329 (emphasis added; footnote omitted). ***Afanador*** is clear: where the Government has received information of requisite detail from a confidential source, and where enough of that detail has been verified (albeit detail of otherwise innocent activity), reasonable suspicion to conduct a non-routine border search is established.

Of course, this case differs from ***Afanador*** in one respect — here, an outbound search is involved. This case mirrors ***Afanador***, however, in almost every other respect. First, the information provided to Customs Agents here was the same in kind and degree as that provided to Customs Agents in ***Afanador***. Between 24 and 25 August 1998, Rios learned: (1) Roberts; (2) would fly into IAH; (3) from Louisiana; (4) on 25 August 1998; (5) continue on an international flight; (6) carrying a shaving kit; (7) holding diskettes; (8) containing child pornography.

Second, the degree of independent corroboration here is nearly identical to that in ***Afanador***. That Roberts was flying from Louisiana to Houston was corroborated when Agent Coffman matched Roberts to his photograph as he disembarked the flight from Louisiana. That Roberts would connect to an international flight was corroborated when Agents checked the flight database and confirmed Roberts was scheduled on the Paris-flight.

That the source of the information on which Agents in the present case acted (other law enforcement officers) differed from

17

that on which the Agents in **Afanador** acted (a confidential informant) is of no consequence.[5]   As discussed *supra*, **Salinas-Garza** involved an outgoing border search conducted pursuant to the earlier "reasonable cause" version of 31 U.S.C. § 5317(b). In that case, the Customs Agent who conducted the stop and search had received information from a Drug Enforcement Agent:

> DEA agent Saldana called Cano early in the morning informing him that a specifically named person, Salinas-Garza, would be attempting to cross the border at 6:00 A.M. with a large sum of money in a dark colored Ford pickup truck having a specifically identified license plate. At 6:15 A.M. a dark colored Ford pickup truck approached, with a license plate number identical but for one transposed digit. Upon asking for identification, the customs agents verified the person as Salinas-Garza.

803 F.2d at 837. Our court concluded that the information received and corroborated created "a reasonable cause or suspicion to stop the vehicle and inquire whether Salinas-Garza was transporting monetary instruments". **Id.** Moreover, our court ruled that, "[a]fter [Salinas-Garza] responded in the negative and since all the other information proved to be correct, it was reasonable for the agents to believe Salinas-Garza was violating section 5316(a)(1)(A) and to then search the vehicle". **Id.**

---

[5]Agent Rios testified he was unaware of the source or reliability of the information received from RAC-Lake Charles and the Natchitoches Parish Sheriff's Office.

18

Salinas-Garza moved to suppress evidence seized during the search, contending in part "that reasonable suspicion did not exist because the only basis for the search was information from [DEA Agent] Saldana, who received it from an unidentified source of unknown reliability". *Id.* at 838. Our court held: "While it is not entirely clear where the information originally came from, ... when the details of the tip are corroborated by independent investigation, it may give rise to a reasonable suspicion". *Id.*

As in *Salinas-Garza*, "[t]he accurate transmission by ... law enforcement agent[s] of articulable objective facts, subsequently corroborated, was sufficient to create a reasonable suspicion in the minds of the customs agents", *id.* at 837, to search Roberts' luggage, including the shaving kit, at the jetway. Further corroborated by Roberts' evasiveness and the discovery of the diskettes in his shaving kit, that suspicion warranted the Agents' escorting Roberts to the secondary area for questioning.

C.

Concerning the subsequent searches of Roberts' computer and diskettes, the district court ruled, and we agree, that Roberts consented to both: Roberts waived his *Miranda* rights; signed a consent-to-search form authorizing the Agents to "conduct a complete search of [his] luggage, computer, [and] diskettes" and "take any letters, papers, materials, or other property which they

19

may desire to examine"; and signed a notice of abandonment and assent to forfeiture.

Roberts contends his consent was obtained unlawfully, maintaining that the Agents induced his consent by threatening to proceed with the search regardless. His assertion is irrelevant; before the Agents searched the computer or diskettes, Roberts admitted to Agent Coffman that the diskettes contained child pornography. "Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause." *United States v. Harris*, 403 U.S. 573, 583 (1971). The subsequent search and seizure of the computer and diskettes were justified on probable cause grounds at that point, and the Agents properly and immediately administered the *Miranda* warnings.

## III.

The initial jetway search was permitted by reasonable suspicion that Roberts was about to board an international flight with child pornography in tote. The subsequent search and seizure of the computer and diskettes were permitted by probable cause resulting from Roberts' admission. Because there was no unlawful search or seizure, there was likewise no poisonous fruit. Therefore, all evidence obtained, including Roberts' statements, was admissible.

*AFFIRMED*