UNITED STATES of America,
Plaintiff–Appellee,

v.

John Woodward ICKES, Jr.,
Defendant–Appellant.

No. 03–4907.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 27, 2004.

Decided Jan. 4, 2005.

**502**

**ARGUED:** Robert James Wagner, Assistant Federal Public Defender, Office of the Federal Public Defender, Richmond, Virginia, for Appellant. Brian Ronald Hood, Assistant United States Attorney, Office of the United States Attorney, Richmond, Virginia, for Appellee. **ON BRIEF:** Frank W. Dunham, Jr., Federal Public Defender, Frances H. Pratt, Research and Writing Attorney, Office of the Federal Public Defender, Alexandria, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Michael J. Elston, Assistant United States Attorney, Office of the United States Attorney, Alexandria, Virginia, for Appellee.

Before WILKINSON, GREGORY, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Judge GREGORY and Judge DUNCAN joined.

## OPINION

WILKINSON, Circuit Judge.

John Woodward Ickes, Jr., was attempting to enter the United States from Canada when U.S. Customs agents searched his van. The agents found several illegal items, most notably images of child pornography stored in photo albums and on Ickes's computer. Ickes was charged and convicted of transporting child pornography in violation of federal law. Prior to trial, the district court denied Ickes's motion to suppress the evidence obtained at the border.

■ We agree with the district court that the warrantless search of Ickes's van was permissible. Both Congress and the Supreme Court have made clear that extensive searches at the border are permitted, even if the same search elsewhere would not be. We refuse to undermine this well-settled law by restrictively reading the statutory language in 19 U.S.C. § 1581(a) or by carving out a First Amendment exception to the border search doctrine. We therefore affirm Ickes's conviction.

### I.

On August 4, 2000, John Ickes drove to the Canadian border with the United States, arriving at the Ambassador Bridge port of entry near Detroit, Michigan. At the primary inspection point, he told a U.S. Customs Inspector that he was returning from vacation. The inspector, however, was puzzled by this statement because Ickes's van appeared to contain "everything he own[ed]."

Ickes was referred to a second inspector's station, where Agent Merchel Albanese began a routine inspection of the van. Initially, Agent Albanese was inclined to give Ickes's vehicle only a cursory search. However, his suspicions were raised after discovering a video camera containing a tape of a tennis match which focused excessively on a young ball boy. This led Albanese to enlist the help of a colleague and to search the van more thoroughly.

The agents found marijuana seeds, marijuana pipes, and a copy of a Virginia warrant for Ickes's arrest. They also found several albums containing photographs of provocatively-posed prepubescent boys, most nude or semi-nude.

At this point, the agents placed Ickes under arrest and detained him. They ran his name through their computer and discovered that he was subject to two outstanding warrants—one from the Bureau of Alcohol, Tobacco, and Firearms, and one from Chesterfield County, Virginia.

While Ickes was in custody, but before he was interrogated, several agents continued to search the van. They confiscated a computer and approximately 75 disks containing additional child pornography. One of the disks ultimately revealed a home-movie of Ickes fondling the genitals of two young children. The mother of the two children later testified that Ickes was a family friend who had babysat her children several times in their Virginia home.

While the agents were searching Ickes's van and the contents of his computer, Agent Michael Favier began to ask Ickes some questions. Favier read Ickes his *Miranda* rights, which Ickes waived in writing. Then Favier asked Ickes if the computer contained anything illegal on it. Ickes admitted that stored on the computer were Russian videos of fourteen and fifteen year-old children engaged in sexual acts. Ickes also confirmed the validity of the outstanding warrants and disclosed that he was wanted for child abuse charges in Virginia.

On May 8, 2003, Ickes was charged with transporting child pornography, in violation of 18 U.S.C. § 2252(a)(1) (2000), and with another count which was subsequently dismissed. Prior to trial, Ickes filed a motion to suppress the contents of the computer and the disks. He alleged that the warrantless search which produced this evidence violated his First and Fourth Amendment rights.

The district court denied Ickes's motion, holding that the search fell under the extended border search doctrine—an established exception to the Fourth Amendment warrant requirement. After a bench trial, the district court found Ickes guilty of transporting child pornography in violation of 18 U.S.C. § 2252(a)(1). The court sentenced him to 130 months in prison.

Ickes now appeals his conviction by challenging the district court's decision to deny his suppression motion. As a conclusion of law, we review that ruling de novo, although we review the underlying findings of fact for clear error. *United States v. Holmes,* 376 F.3d 270, 273 (4th Cir. 2004).

## II.

However the Constitution limits the government's ability to search a person's vehicle generally, our law is clear that searches at the border are a different matter altogether. Ickes asks us to erode this clarity either by narrowly construing the congressional mandate in 19 U.S.C. § 1581(a) or by recognizing a First Amendment exception to the border search doctrine. For the following reasons, we decline both requests.

### A.

Ickes first claims that Congress has not authorized the search of his computer and disks. We cannot agree. Congress has been emphatic in its empowerment of U.S. Customs officials. The statutory language is sweeping:

> Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters, ... or at any

other authorized place ... and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board....

19 U.S.C. § 1581(a) (2000).

Ickes claims that this statutory language is insufficient to cover the search of his computer and disks. He bases this argument on the fact that the statute does not explicitly mention electronic equipment. He concludes from this omission that it is "obvious" that Congress did not intend its statute to cover those items. He invokes the maxim of statutory construction that the inclusion of several items in a list— here, "trunk, package, or cargo"—implies the exclusion of others.

■■ Despite Ickes's contentions to the contrary, the plain language of the statute authorizes expansive border searches. To determine whether statutory language is plain, courts must look to "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Each of these three guideposts leads us to reject Ickes's interpretation of the statute.

■■ First, the statutory language. Congress chose to use the embracive term "cargo" in § 1581(a). A "fundamental canon of statutory construction requires that unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *United States v. Maxwell*, 285 F.3d 336, 340 (4th Cir.2002) (internal quotation omitted). Black's Law Dictionary defines "cargo" to mean "goods transported by a vessel, airplane, or vehicle." Black's Law Dictionary 226 (8th ed.2004).

In this case, it is undisputed that Ickes's computer and disks were being transported by his vehicle. We are unpersuaded that these particular transported goods are somehow exempt from the ordinary definition of "cargo." To hold otherwise would undermine the long-standing practice of seizing goods at the border even when the type of good is not specified in the statute. *See, e.g., United States v. Flores–Montano*, 541 U.S. 149, 124 S.Ct. 1582, 1586, 158 L.Ed.2d 311 (2004) (upholding a search involving the disassembly of a gas tank); *United States v. Roberts*, 274 F.3d 1007, 1016 (5th Cir.2001) (upholding a search involving the opening of a shaving kit with a computer disk hidden inside it); *United States v. Caminos*, 770 F.2d 361, 363 (3d Cir.1985) (upholding a search involving the prying open of a wood carving).

■■ Second, Ickes's narrow interpretation of the word "cargo" is inconsistent with the specific context in which the word is used. In drafting § 1581(a), Congress chose to use the word "any" no less than five times. The statute reads:

> *Any* officer ... may at *any* time go on board of *any* vessel or vehicle at *any* place in the United States ... [and search the vehicle] ... and *any* person, trunk, package or cargo on board.

§ 1581(a)(emphasis added). As we have explained before, "[t]he word 'any' is a term of great breadth. Read naturally, [it] has an expansive meaning...." *Mapoy v. Carroll*, 185 F.3d 224, 229 (4th Cir.1999)(internal quotations and citations omitted). Given Congress's repeated use of the word "any" immediately preceding its list of what may be searched, we find it unreasonable to construe the list restrictively.

Finally, we are convinced that Ickes's argument must fail after analyzing the "broader context of the statute as a whole." *Robinson*, 519 U.S. at 341, 117

S.Ct. 843. We construe § 1581(a) against the back-drop of an "impressive historical pedigree of the Government's power and interest" at the border. *Flores–Montano,* 124 S.Ct. at 1586 (internal quotation omitted). As detailed below, since the founding of our country Congress has "granted the Executive plenary authority to conduct routine searches and seizures at the border." *Id.* at 1585, citing *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985).

It is no surprise, therefore, that courts have historically construed the language of § 1581(a) in an expansive manner.[1] The realization that important national security interests are at stake "has resulted in courts giving the broadest interpretation compatible with our constitutional principles in construing the statutory powers of customs officials." *United States v. Stanley,* 545 F.2d 661, 666 (9th Cir.1976). *See also United States v. Boumelhem,* 339 F.3d 414, 419–20 (6th Cir.2003); *United States v. 1903 Obscene Magazines,* 907 F.2d 1338, 1341 (2d Cir.1990).

We hold that the government was authorized by 19 U.S.C. § 1581(a) to search Ickes's computer and disks.[2]

### B.

Ickes further argues that even if Congress purports to permit the search of his computer and disks, such a search would be unconstitutional. We disagree.

Last term, the Supreme Court instructed that:

> The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border. Time and again, we have stated that searches made at the border ... are reasonable simply by virtue of the fact that they occur at the border.

*Flores–Montano,* 124 S.Ct. at 1585 (holding that the government's authority to conduct border searches is broad enough to permit the removal, disassembly, and reassembly of a vehicle's fuel tank).

█ The border search doctrine is not a recent development in the law. The "longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless 'reasonable' has a history as old as the Fourth Amendment itself." *United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). In fact, the same Congress which proposed the Fourth Amendment to state legislatures also enacted the first far-reaching customs statute in 1790. *Id.* at 616, 97 S.Ct. 1972. Thus, since the birth of our country, customs officials have wielded broad authority to search the belongings of would-be entrants without obtaining a warrant and without establishing probable cause. *Id. See also Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. 3304; *United States v.*

---

1. While noting that a simple reading of § 1581(a) suggests a broad grant of authority to the government, the Fourth Circuit has also cautioned that the statute be interpreted "in light of the fourth amendment's requirement that seizures and searches be reasonable." *Blair v. United States,* 665 F.2d 500, 505 (4th Cir.1981). This reasonableness requirement is certainly met in this case, in light of the Supreme Court's recent instruction that searches of belongings at the border "are reasonable simply by virtue of the fact that they occur at the border." *Flores–Mon-*

*tano,* 124 S.Ct. at 1585 (internal quotation omitted).

2. Ickes additionally argues that the government had no authority to search his computer under 19 U.S.C. § 482 (2000). This statute is broadly worded, much like § 1581. However, we need not address the government's authority to search Ickes's van under this second provision of Title 19 because we find it is authorized to do so by the first.

*Villamonte–Marquez,* 462 U.S. 579, 584–85, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983).

This well-recognized exception to the safeguards of the Fourth Amendment comes with an equally well-established rationale. For it is "axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *Flores–Montano,* 124 S.Ct. at 1586. The government has an overriding interest in securing the safety of its citizens and to do this it must seek to prevent "the introduction of contraband into this country." *Montoya de Hernandez,* 473 U.S. at 537, 105 S.Ct. 3304.

A greater interest on the side of the government at the border is coupled with a lesser interest on the side of the potential entrant. Since "a port of entry is not a traveler's home," his expectation of privacy there is substantially lessened. *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 376, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971)(plurality opinion). When someone approaches a border, he should not be surprised that "[c]ustoms officers characteristically inspect luggage . . .; it is an old practice and is intimately associated with excluding illegal articles from the country." *Id.*

■ Despite the Supreme Court's insistence that U.S. officials be given broad authority to conduct border searches, Ickes argues that the search of his computer was nonetheless invalid since it involved the search of expressive material. In essence, Ickes asks us to carve out a First Amendment exception to the border search doctrine.

■ However, the ramifications of accepting Ickes's First Amendment argument would be quite staggering. Ickes suggests that the border search doctrine does not apply when the item being searched is something "expressive." But this cannot be the case. The border search doctrine is justified by the "longstanding right of the sovereign to protect itself." *Flores–Montano,* 124 S.Ct. at 1585, quoting *Ramsey,* 431 U.S. at 616, 97 S.Ct. 1972. Particularly in today's world, national security interests may require uncovering terrorist communications, which are inherently "expressive." Following Ickes's logic would create a sanctuary at the border for all expressive material—even for terrorist plans. This would undermine the compelling reasons that lie at the very heart of the border search doctrine. Ickes's argument, at bottom, proves too much.

Furthermore, recognizing a First Amendment exception to the border search doctrine would ensure significant headaches for those forced to determine its scope. Disputes about whether material is obscene, for example, are not always easily resolved. *See, e.g., Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Were we to carve out this First Amendment exception, government agents at the border (and subsequently courts) would be faced with drawing difficult lines. First, agents would have to decide—on their feet—which expressive material is covered by the First Amendment. And then, in cases where they conclude that the exception applies, they would still have to determine if probable cause existed. These sorts of legal wrangles at the border are exactly what the Supreme Court wished to avoid by sanctioning expansive border searches. *See Flores–Montano,* 124 S.Ct. at 1585–86. We refuse to put these issues into play and thereby divert customs officials from their charge of policing our borders and protecting our country.

Ickes claims that our ruling is sweeping. He warns that "any person carrying a

laptop computer ... on an international flight would be subject to a search of the files on the computer hard drive." This prediction seems far-fetched. Customs agents have neither the time nor the resources to search the contents of every computer.

Indeed, the fallacy of Ickes's argument is no better illustrated than by the facts of his own case. The agents did not inspect the contents of Ickes's computer until they had already discovered marijuana paraphernalia, photo albums of child pornography, a disturbing video focused on a young ball boy, and an outstanding warrant for Ickes's arrest. As a practical matter, computer searches are most likely to occur where—as here—the traveler's conduct or the presence of other items in his possession suggest the need to search further. However, to state the probability that reasonable suspicions will give rise to more intrusive searches is a far cry from enthroning this notion as a matter of constitutional law. The essence of border search doctrine is a reliance upon the trained observations and judgments of customs officials, rather than upon constitutional requirements applied to the inapposite context of this sort of search.

There is an additional flaw in Ickes's First Amendment claim. Ickes argues that cases such as *United States v. Ramsey* demonstrate the Supreme Court's willingness to accord greater protection at the border to expressive materials, as opposed to mere tangible items. However, the Supreme Court drew no such line in *Ramsey*. In fact, its cases indicate a reluctance to do so.

In *Ramsey*, the Court upheld the authority of customs officials to open suspiciously bulky envelopes in the mail. 431 U.S. at 620, 97 S.Ct. 1972. In that case, the relevant postal regulations prohibited the officials from reading the content of the letters without a warrant. *Id.* at 623, 97 S.Ct. 1972. The Court in *Ramsey* specifically found it "unnecessary to consider the constitutional reach of the First Amendment in this area in the absence of the existing statutory and regulatory protection." *Id.* at 624, 97 S.Ct. 1972. Thus, the *Ramsey* Court never reached the question of whether the First Amendment exempts expressive material from the scope of the border search doctrine.

Moreover, since *Ramsey,* the Supreme Court has indicated that should it reach this question, its resolution would be unlikely to favor Ickes. In *New York v. P.J. Video,* 475 U.S. 868, 874, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986) the Court refused to require a higher standard of probable cause for warrant applications when expressive material is involved. It held that:

> an application for a warrant authorizing the seizure of materials presumptively protected by the First Amendment should be evaluated under the same standard of probable cause used to review warrant applications generally.

*Id.* at 875, 106 S.Ct. 1610. Given the Court's reluctance to create a First Amendment exception to the general principles governing warrant applications, we find it unlikely that it would favor a similar exception to the border search doctrine.

We therefore reject Ickes's constitutional argument, and hold that the border search doctrine is not subject to a First Amendment exception.

### III.

Because customs agents were authorized by Congress to search all the cargo in Ickes's vehicle, and because no constitutional impediment exists to their doing so,

we reject Ickes's claims and affirm his conviction.[3]

*AFFIRMED.*

---

**3.** On November 13, 2003, Ickes was sentenced to 130 months imprisonment. The final sentencing order states that "[f]orfeiture has not been ordered in this case." We thus have a final judgment from which the government has not appealed. Because it is not properly before us, we do not address the question of whether the absence of a forfeiture order in the final judgment was due to clerical error. *See El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 480, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999)("[I]n more than two centuries of repeatedly endorsing the cross-appeal requirement, not a single one of our holdings has ever recognized an exception to the rule.")