United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 12, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

———————————————

No. 03-20830

———————————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

KOLAWOLE ODUTAYO,

Defendant - Appellant.

————————————————————————————

Appeal from the United States District Court
For the Southern District of Texas, Houston
(No. 4:99-CR-99-1)

————————————————————————————

Before JONES, WIENER, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Defendant-appellant Kolawole Odutayo appeals his conviction for mail fraud in violation of

18 U.S.C. § 1341 and for using a false name or address to execute a mail fraud scheme in violation

of 18 U.S.C. § 1342. Odutayo specifically appeals the denial of his motion to suppress evidence

seized from an outbound flight because the evidence was the fruit of an unreasonable search in

violation of the Fourth Amendment. In addressing his challenge, we face the question of whether the

"border search exception" to the Fourth Amendment, traditionally applied to searches of incoming

1

cargo and baggage, applies with equal force to outgoing searches. We answer in the affirmative, and uphold the district court's decision.

## I. FACTS AND PROCEEDINGS

In 1994, Odutayo attempted to smuggle out of the United States thousands of dollars worth of illegally obtained video and music discs. Odutayo procured the discs through the exploitation of mail order clubs sponsored by major music distributors such as Columbia House and BMG Music Services. As part of their promotions, these companies would send a customer eight or ten discs either for free or for a nominal fee. In return, the customer would promise to purchase a number of discs at regular price after a set amount of time, typically a year or two. Using a number of aliases and addresses, Odutayo deceived the clubs in order to obtain thousands of factory-quality discs without meeting his reciprocal obligations. In April 1994, Odutayo packed his unlawfully obtained collection into sixteen similar cardboard boxes, and checked them as baggage at Bush International Airport in Houston, Texas on an international flight bound for Nigeria, via London.

Neither Odutayo nor his loot ever made it out of the United States. Under federal law, anyone who transports more than $2,500 worth of commercial merchandise must fill out a "Shipper's Export Declaration" ("SED"). After being placed in the "baggage pit area"—a non-public depot where baggage is held after it is checked, but before being loaded on the flight—the boxes were brought to the attention of Customs Inspector Harold Taylor. Inspector Taylor, who was empowered to search for contraband such as military equipment, hardware, encrypted software, weapons, ammunition and other illegal-if-exported merchandise, noticed that all of the boxes were marked as being the property of the same person—Odutayo—and that they did not have the requisite SED. Based solely on that information, Inspector Taylor opened the boxes and discovered 700 new laser

2

video discs and over 2,000 new audio discs—the value of which was approximated by the government to be $69,560. That information led to the questioning of Odutayo and the issuance of two search warrants, culminating in his indictment in 1999 for (1) nine counts of mail fraud in violation of § 1341, and (2) nine counts of using false names or addresses to execute a mail fraud scheme in violation of § 1342.[1]

On February 2003, Odutayo filed a motion to suppress the 16 boxes of discs as evidence, a motion the district court denied after an evidentiary hearing in April 2003. Although the district court determined that reasonable suspicion did not exist for Inspector Taylor to search the boxes, it nevertheless held that the search was reasonable under the Fourth Amendment as a "routine" border search. After a bench trial—Odutayo waived his right to a jury—Odutayo was found guilty on all counts, and sentenced to 5 months in prison, three years of supervised release, and specially assessed $950. Odutayo timely appealed the judgment, arguing both that (a) the district court erred in denying his motion to suppress and, for the first time on appeal, (b) his conviction violates the Double Jeopardy Clause of the Fifth Amendment as a multiplicitious punishment.

## II. DISCUSSION

A. Reasonableness Under the Fourth Amendment

Odutayo challenges the district court's denial of his motion to suppress, arguing that the evidence was the fruit of a warrantless, unconstitutional search. We review *de novo* the district court's legal conclusions regarding a motion to suppress. *See United States v. Washington*, 340 F.3d 222, 226 (5th Cir. 2003). Following the lead from the Supreme Court's decision in *United States v.*

---

[1] Odutayo was also indicted for one count of making false statements to a U.S. Customs Inspector.

*Ramsey*, 431 U.S. 606 (1977), this circuit has employed a two-step analysis for determining the constitutionality of a warrantless search or seizure. *United States v. Williams*, 617 F.2d 1063, 1074 (5th Cir. 1980). First, the government must establish some statutory or legal authority under which it acted. In the absence of such authority, "a court must conclude, without any further consideration, that the search or seizure was unconstitutional." *Id.* In the presence of such authority, the Court must then determine whether the duly authorized search or seizure was reasonable under the Fourth Amendment. *Id.*; *see also United States v. Berisha*, 925 F.2d 791, 793 (5th Cir. 1991) (detailing the two-part test).

1. Statutory authority provided under 22 U.S.C. § 401.

Inspector Taylor acted under the authority of 22 U.S.C. § 401. In pertinent part, it reads:

> Whenever an attempt is made to export or ship from or take out of the United States any arms or munitions of war or other articles in violation of law, or whenever it is known or there shall be probable cause to believe that any arms or munitions of war or other articles are intended to be or are being or have been exported or removed from the United States in violation of law, the Secretary of the Treasury, or any person duly authorized for the purpose by the President, may seize and detain such [articles] . . . .

22 U.S.C. § 401(a) (1994). Section 401(a) thus provides that probable cause is necessary to seize and detain certain illegal articles. Although the provision does not explicitly speak to searches, this circuit has held that § 401(a) implicitly provides statutory authority for searches. *Samora v. United States*, 406 F.2d 1095, 1098 (5th Cir. 1969). Odutayo concedes that § 401(a) provides governmental officials the power to perform searches, but he nevertheless contends that that power is subject to a probable cause limitation.

4

There is nothing in the statute that places such a restriction on searches, and we refuse to create one.[2] Section 401(a) is nearly identical to its predecessor, the Espionage Act of 1917, ch. 30, tit. VI, 40 Stat. 223 (1917), which applied its probable cause requirement only to seizures, and not searches. *See United States v. Ajlouny*, 629 F.2d 830, 836 (2d Cir. 1980). As the Second Circuit noted in *Ajlouny*, the Espionage Act was designed to protect "innocent owners and claimants from the inconvenience and expense associated with unwarranted *seizure* and *detention* of their property." *Id.* (emphases added). We agree with the Second Circuit that "[t]here is no indication . . . that the law was also intended to protect persons against the less serious interference with property rights associated with a customs *search*." *Id.* (emphasis added). Finally, placing such a stringent requirement onto border searches would tend to gut the ability of law enforcement to seize contraband, as probable cause for many seizures will be established only after a search of a package's contents. *See, e.g.*, *United States v. Marti*, 321 F. Supp. 59, 63–64 (S.D.N.Y. 1970) ("An agent may not seize contraband until he confirms his belief that such material is, in fact, being exported or removed from the United States. Confirmation can usually come only from a preliminary search."). Accordingly, we hold that Inspector Taylor's search was authorized by § 401(a).

2. Constitutionality of the search under the Fourth Amendment.

Because Inspector Taylor acted within his legal authority, his actions can only be unconstitutional if they were unreasonable under the Fourth Amendment. The Fourth Amendment

---

[2] Odutayo argues that this court recognized a probable cause requirement for searches under § 401(a) in *Samora v. United States*, 406 F.2d 1095, 1098 (5th Cir. 1969). There, the court found that the search of a car at the border was reasonable under § 401(a) because probable cause existed. *Id.* Its holding, while resting on the existence of probable cause, did not *impose* such a requirement. Indeed, the court itself stated that "[w]e need not consider other grounds on which the government claims the search was valid." *Id.* at 1099; *see also United States v. Roberts*, 274 F.3d 1007, 1012 (5th Cir. 2001) (recognizing distinction).

5

provides, "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. CONST. amend. IV.  Because of that textual requirement, searches or seizures performed without the authority of a warrant "are per se unreasonable."  *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993).  There are, however, a few "narrowly defined exceptions,"  *id.*, one of which is for routine searches at "'the international border or its functional equivalent.'"  *United States v. Roberts*, 274 F.3d 1007, 1011 (5th Cir. 2001) (quoting *United States v. Rivas*, 157 F.3d 364, 367 (5th Cir. 1998)) (emphases omitted).  This "longstanding, historical[]" exception to the Fourth Amendment's general requirement of a warrant was based on rationales relating to incoming cargo. *United States v. Ramsey*, 431 U.S. 606, 622 (1977).

The district court determined that the search was routine, a finding that Odutayo does not challenge on appeal.  Rather, he argues that even if the search was routine, the traditional border search exception should not be extended to *outgoing* searches.  If he is right, then the evidence here must be suppressed because Inspector Taylor lacked the necessary probable cause.

The Supreme Court indicated in *California Bankers Ass'n v. Schultz* that the border search exception might apply to outgoing searches, saying that "those entering and leaving the country may be examined as to their belongings and effects, all without violating the Fourth Amendment."  416 U.S. 21, 63 (1974).  Although dicta, a number of our sister circuits—the Second, Third, Fourth, Sixth, Eighth, and Ninth—have extended the border exception to outgoing searches.  *See Ajlouny*, 629 F.2d at 834; *United States v. Ezeiruaku*, 936 F.2d 136, 143 (3d Cir. 1991); *United States v. Oriakhi*, 57 F.3d 1290, 1296–97 (4th Cir. 1995); *United States v. Boumelhem*, 339 F.3d 414, 420–23

6

(6th Cir. 2003); *United States v. Udofot*, 711 F.2d 831, 838–40 (8th Cir. 1983); *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir. 1982).[3]

Although this circuit has not adopted the border search exception for outgoing searches *in toto*, it has viewed such an application favorably. *See Roberts*, 274 F.3d at 1013 (citing *United States v. Salinas-Garza*, 803 F.2d 834 (5th Cir. 1986)) (discussing *Salinas-Garza*'s implicit recognition that the Constitution requires less than probable cause for outgoing border searches); *Berisha*, 925 F.2d at 795 (applying the border search exception to outgoing currency searches). In *United States v. Berisha*, this Court addressed the extension of the routine border search exception as applied to outgoing currency searches. 925 F.2d at 795. There, we noted that incoming and outgoing border searches have "several features in common." *Id.* In both, "the government is interested in protecting some interest of United States citizens, there is a likelihood of smuggling attempts at the border, and the individual is on notice that his privacy may be invaded when he crosses the border." *Id.* These considerations certainly apply in the context here: stemming the illegal exportation of weapons and other equipment implicates a strong national security interest for U.S. citizens and there is certainly a reduced expectation of privacy for passengers (whose luggage is, among other things, routinely x-rayed by airport security) on international flights. *Boumelhem*, 339 F.3d at 422–23.

We went on to say in *Berisha* that in the specific context of currency exchanges, "the underlying purpose for the foreign transaction reporting requirements was to regulate the export of monetary instruments in order to prevent the use of international currency transactions to evade domestic criminal, tax, and regulatory laws." *Berisha*, 925 F.2d at 795. The interest in the regulation of the exportation of weapons, ammunition, and encryption technology, similar to the interest in the

---

[3] No circuit that has addressed this question has held otherwise.

7

flow of currency, represents the fundamental power—indeed, responsibility—of every sovereign nation to maintain its national security. *Boumelhem*, 339 F.3d at 423 ("From the sovereign's power to protect itself is derived its power to prohibit the export of its currency, national treasures, and other assets.") (quoting *Oriakhi*, 57 F.3d at 1297) (internal quotations omitted). Moreover, "inherent in national sovereignty are the overarching rights of a nation . . . to secure its territory and assets." *Oriakhi*, 57 F.3d at 1296. Outgoing searches implicate these national security and territorial integrity interests. Therefore, today we join our sister circuits in holding that the border search exception applies for all outgoing searches at the border.

B. Double Jeopardy

Odutayo also challenges, for the first time on appeal, his conviction as unconstitutional under the Double Jeopardy Clause of the Fifth Amendment. Specifically, he alleges that his convictions under §§ 1341 and 1342 were multiple punishments for the same offense. Because he failed to raise this argument in front of the district court, we review for plain error only, *see United States v. Lankford*, 196 F.3d 563, 577 (5th Cir. 1999), under which we may exercise our discretion to remedy an injury only if the error affects substantial rights "seriously affect[ing] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 535 U.S. 625, 631 (2002) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)) (internal quotations omitted).

The Fifth Amendment's Double Jeopardy Clause states that "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The clause is meant to protect against both multiple prosecutions and, relevant here, multiple punishments for the same offense. In *Blockburger v. United States*, 284 U.S. 299 (1932), the Supreme Court enunciated the proper test for determining whether a defendant has been punished twice for the same

8

offense: "whether each provision requires proof of a fact which the other does not." *Id.* at 304; *see also United States v. Delgado*, 256 F.3d 264, 272 (5th Cir. 2001) (noting that "double jeopardy concerns are not raised if each crime requires an element of proof not required by the other crimes charged"). The application of the *Blockburger* test does not involve the detailed examination of the case's factual circumstances; rather, our inquiry focuses on the elements of the statutory offense. *Lankford*, 196 F.3d at 577–78. In other words, the question is not whether *this* violation of § 1342 includes a violation of § 1341, but rather whether *all* violations of § 1342 constitute violations of § 1341, and vice versa. *United States v. Singleton*, 16 F.3d 1419, 1422 (5th Cir. 1994).

The Double Jeopardy Clause poses no constitutional prohibition to Odutayo's conviction. For a mail fraud violation under § 1341, the government must show that there was "(1) a scheme to defraud; (2) the use of the mails to execute the scheme; and (3) the specific intent to defraud." *United States v. Bieganowski*, 313 F.3d 264, 275 (5th Cir. 2002). Section 1342 requires proof of the use of a fictitious name or address for "the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in section 1341 . . . or any other unlawful business." 18 U.S.C. § 1342 (1994). Due to § 1342's fictitious name or address requirement, it is clear that § 1342 has "an element of proof not required by" § 1341, and that all violations of § 1341 do not necessarily include a violation of § 1342. *Delgado*, 256 F.3d at 272. The only remaining question is whether a violation of § 1342 necessarily includes a violation of § 1341. *Id.* Section 1342, while mentioning and including violations of § 1341, applies explicitly to the use of a false name or address for the use of "promoting . . . any other unlawful business." By its plain language, schemes to defraud such as those covered in § 1341 are included in § 1342, but it does not follow that all violations of § 1342 will include a violation of § 1341—by promoting an unlawful

9

business that does not involve fraud, for example, a defendant may violate § 1342 without concurrently violating § 1341. Odutayo's argument fails the *Blockburger* test.

## III. CONCLUSION

The district court's judgment is AFFIRMED.