**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellant,*

v.

MICHAEL TIMOTHY ARNOLD,
             *Defendant-Appellee.*

No. 06-50581

D.C. No.
CR-05-00772-DDP

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
October 18, 2007—Pasadena, California

Filed April 21, 2008
Amended July 10, 2008

Before: Diarmuid F. O'Scannlain and Milan D. Smith, Jr.,
Circuit Judges, and Michael W. Mosman,* District Judge.

Opinion by Judge O'Scannlain

*The Honorable Michael W. Mosman, United States District Judge for
the District of Oregon, sitting by designation.

## COUNSEL

Steve Kim, Assistant United States Attorney, Criminal Appeals Section, Los Angeles, California, argued the cause for the plaintiff-appellant and filed briefs; George S. Cardona, United States Attorney, and Thomas P. O'Brien, Assistant United States Attorney, Chief, Criminal Division, Los Angeles, California, were on the briefs.

Marilyn E. Bednarski, Kaye, McLane, & Bednarski, LLP, Pasadena, California, argued the cause for the defendant-appellee and filed a brief; Kevin Lahue, Kaye, McLane, & Bednarski, LLP, Pasadena, California, was on the brief.

## ORDER

The opinion filed April 21, 2008, is amended as follows:

1.	At 523 F.3d 941, 946 n.1 (9th Cir. 2008), in the first sentence replace "incoming" with "outgoing."

With the foregoing amendment, the panel has unanimously voted to deny the petition for rehearing. Judge O'Scannlain and Judge M. Smith, Jr., vote to deny the petition for rehearing en banc and Judge Mosman so recommends. The full court has been advised of the petition for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc are DENIED. Further petitions for rehearing or rehearing en banc may not be filed.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether customs officers at Los Angeles International Airport may examine the electronic contents of a passenger's laptop computer without reasonable suspicion.

I

On July 17, 2005, forty-three-year-old Michael Arnold arrived at Los Angeles International Airport ("LAX") after a nearly twenty-hour flight from the Philippines. After retrieving his luggage from the baggage claim, Arnold proceeded to customs. U.S. Customs and Border Patrol ("CBP") Officer Laura Peng first saw Arnold while he was in line waiting to go through the checkpoint and selected him for secondary questioning. She asked Arnold where he had traveled, the purpose of his travel, and the length of his trip. Arnold stated that he had been on vacation for three weeks visiting friends in the Philippines.

Peng then inspected Arnold's luggage, which contained his laptop computer, a separate hard drive, a computer memory stick (also called a flash drive or USB drive), and six compact discs. Peng instructed Arnold to turn on the computer so she could see if it was functioning. While the computer was booting up, Peng turned it over to her colleague, CBP Officer John Roberts, and continued to inspect Arnold's luggage.

When the computer had booted up, its desktop displayed numerous icons and folders. Two folders were entitled "Kodak Pictures" and one was entitled "Kodak Memories." Peng and Roberts clicked on the Kodak folders, opened the files, and viewed the photos on Arnold's computer including one that depicted two nude women. Roberts called in supervisors, who in turn called in special agents with the United States Department of Homeland Security, Immigration and

Customs Enforcement ("ICE"). The ICE agents questioned Arnold about the contents of his computer and detained him for several hours. They examined the computer equipment and found numerous images depicting what they believed to be child pornography. The officers seized the computer and storage devices but released Arnold. Two weeks later, federal agents obtained a warrant.

A grand jury charged Arnold with: (1) "knowingly transport[ing] child pornography, as defined in [18 U.S.C. § 2256(8)(A)], in interstate and foreign commerce, by any means, including by computer, knowing that the images were child pornography"; (2) "knowingly possess[ing] a computer hard drive and compact discs which both contained more than one image of child pornography, as defined in [18 U.S.C. § 2256(8)(A)], that had been shipped and transported in interstate and foreign commerce by any means, including by computer, knowing that the images were child pornography"; and (3) "knowingly and intentionally travel[ing] in foreign commerce and attempt[ing] to engage in illicit sexual conduct, as defined in [18 U.S.C. § 2423(f)], in a foreign place, namely, the Philippines, with a person under 18 years of age, in violation of [18 U.S.C. § 2423(c)]."

Arnold filed a motion to suppress arguing that the government conducted the search without reasonable suspicion. The government countered that: (1) reasonable suspicion was not required under the Fourth Amendment because of the border-search doctrine; and (2) if reasonable suspicion were necessary, that it was present in this case.

The district court granted Arnold's motion to suppress finding that: (1) reasonable suspicion was indeed necessary to search the laptop; and (2) the government had failed to meet the burden of showing that the CBP officers had reasonable suspicion to search.

The government timely appealed the district court's order granting the motion to suppress.

## II

Arnold argues that the district court was correct in concluding that reasonable suspicion was required to search his laptop at the border because it is distinguishable from other containers of documents based on its ability to store greater amounts of information and its unique role in modern life.

Arnold argues that "laptop computers are fundamentally different from traditional closed containers," and analogizes them to "homes" and the "human mind." Arnold's analogy of a laptop to a home is based on his conclusion that a laptop's capacity allows for the storage of personal documents in an amount equivalent to that stored in one's home. He argues that a laptop is like the "human mind" because of its ability to record ideas, e-mail, internet chats and web-surfing habits.

Lastly, Arnold argues that application of First Amendment principles requires us to rule contrary to the Fourth Circuit in *United States v. Ickes*, 393 F.3d 501, 506-08 (4th Cir. 2005) (rejecting the argument based on the First Amendment that a higher level of suspicion is needed for searches of "expressive material"), and to promulgate a reasonable suspicion requirement for border searches where the risk is high that expressive material will be exposed.

## III

### A

**[1]** The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Searches of international passengers at American airports are considered border searches because they occur at the "functional equivalent of a border." *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) ("For . . . example, a search of the passengers and

cargo of an airplane arriving at a St. Louis airport after a non-stop flight from Mexico City would clearly be the functional equivalent of a border search."). "It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004). Generally, "searches made at the border . . . are reasonable simply by virtue of the fact that they occur at the border . . . ." *United States v. Ramsey*, 431 U.S. 606, 616 (1977).

**[2]** The Supreme Court has stated that:

> The authority of the United States to search the baggage of arriving international travelers is based on its inherent sovereign authority to protect its territorial integrity. By reason of that authority, it is entitled to require that whoever seeks entry must establish the right to enter and to bring into the country whatever he may carry.

*Torres v. Puerto Rico*, 442 U.S. 465, 472-73 (1979). In other words, the "Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *Flores-Montano*, 541 U.S. at 152. Therefore, "[t]he luggage carried by a traveler entering the country may be searched at random by a customs officer . . . no matter how great the traveler's desire to conceal the contents may be." *United States v. Ross*, 456 U.S. 798, 823 (1982). Furthermore, "a traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf [may] claim an equal right to conceal his possessions from official inspection as the sophisticated executive with the locked attaché case." *Id.* at 822.

B

**[3]** Courts have long held that searches of closed containers and their contents can be conducted at the border without par-

ticularized suspicion under the Fourth Amendment. Searches of the following specific items have been upheld without particularized suspicion: (1) the contents of a traveler's briefcase and luggage, *United States v. Tsai,* 282 F.3d 690, 696 (9th Cir. 2002); (2) a traveler's "purse, wallet, or pockets," *Henderson v. United States*, 390 F.2d 805, 808 (9th Cir. 1967); (3) papers found in containers such as pockets, see *United States v. Grayson*, 597 F.2d 1225, 1228-29 (9th Cir. 1979) (allowing search without particularized suspicion of papers found in a shirt pocket); and (4) pictures, films and other graphic materials. *See United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376 (1971); *see also 12,200-Ft. Reels of Super 8MM. Film*, 413 U.S. 123, 124-25 (1973) ("Import restrictions and searches of persons or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations.").

Nevertheless, the Supreme Court has drawn some limits on the border search power. Specifically, the Supreme Court has held that reasonable suspicion is required to search a traveler's "alimentary canal," *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985), because " '[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusion [beyond the body's surface] on the mere chance that desired evidence might be obtained.' " *Id.* at 540 n.3 (quoting *Schmerber v. California*, 384 U.S. 757, 769 (1966)). However, it has expressly declined to decide "what level of suspicion, *if any*, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches." *Id.* at 541 n.4 (emphasis added). Furthermore, the Supreme Court has rejected creating a balancing test based on a "routine" and "nonroutine" search framework, and has treated the terms as purely descriptive. *See United States v. Cortez-Rocha*, 394 F.3d 1115, 1122 (9th Cir. 2005).

**[4]** Other than when "intrusive searches of *the person*" are at issue, *Flores-Montano*, 541 U.S. at 152 (emphasis added),

the Supreme Court has held open the possibility, "that some searches of *property* are so destructive as to require" particularized suspicion. *Id.* at 155-56 (emphasis added) (holding that complete disassembly and reassembly of a car gas tank did not require particularized suspicion). Indeed, the Supreme Court has left open the question of " 'whether, and under what circumstances, a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it is carried out.' " *Id.* at 155 n.2 (quoting *Ramsey*, 431 U.S. at 618 n.13).

## C

In any event, the district court's holding that particularized suspicion is required to search a laptop, based on cases involving the search of the person, was erroneous. Its reliance on such cases as *United States v. Vance*, 62 F.3d 1152, 1156 (9th Cir. 1995) (holding that "[a]s the search becomes more intrusive, more suspicion is needed" in the context of a search of the human body), to support its use of a sliding intrusiveness scale to determine when reasonable suspicion is needed to search property at the border is misplaced. *United States v. Arnold*, 454 F. Supp. 2d 999, 1002-04 (C.D. Cal. 2006).

[5] The Supreme Court has stated that "[c]omplex balancing tests to determine what is a 'routine' search of a vehicle, as opposed to a more 'intrusive' search of a person, have no place in border searches of vehicles." *Flores-Montano*, 541 U.S. at 152. Arnold argues that the district court was correct to apply an intrusiveness analysis to a laptop search despite the Supreme Court's holding in *Flores-Montano*, by distinguishing between one's privacy interest in a vehicle compared to a laptop. However, this attempt to distinguish *Flores-Montano* is off the mark. The Supreme Court's analysis determining what protection to give a vehicle was not based on the unique characteristics of vehicles with respect to other property, but was based on the fact that a vehicle, as a piece of property, simply does not implicate the same "dignity and pri-

vacy" concerns as "highly intrusive searches of the person." *Flores-Montano*, 541 U.S. at 152.

**[6]** Furthermore, we have expressly repudiated this type of "least restrictive means test" in the border search context. *See Cortez-Rocha*, 394 F.3d at 1123 (refusing to fashion a "least restrictive means test for border control vehicular searches, and . . . refus[ing] to tie the hands of border control inspectors in such a fashion"). Moreover, in both *United States v. Chaudhry*, 424 F.3d 1051, 1054 (9th Cir. 2005) (finding the distinction between "routine" and "non-routine" inapplicable to searches of property) and *Cortez-Rocha*, 394 F.3d at 1122-23, we have recognized that *Flores-Montano* rejected our prior approach of using an intrusiveness analysis to determine the reasonableness of property searches at the international border.

**[7]** Therefore, we are satisfied that reasonable suspicion is not needed for customs officials to search a laptop or other personal electronic storage devices at the border.[1]

IV

While the Supreme Court left open the possibility of requiring reasonable suspicion for certain border searches of property in *Flores-Montano*, 541 U.S. at 155-56, the district court did not base its holding on the two narrow grounds left open by the Supreme Court in that case.

Arnold has never claimed that the government's search of his laptop damaged it in any way; therefore, we need not con-

---

[1]We recently issued an opinion on a separate issue of whether reasonable suspicion is required to search outgoing international correspondence; however, this opinion has since been withdrawn and the case has been reheard by an en banc panel of this court that has yet to issue a decision. *United States v. Seljan*, 497 F.3d 1035 (9th Cir. 2007), *withdrawn by* 512 F.3d 1203 (9th Cir. 2008) (ordering rehearing en banc).

sider whether "exceptional damage to property" applies. Arnold does raise the "particularly offensive manner" exception to the government's broad border search powers.[2] But, there is nothing in the record to indicate that the manner in which the CBP officers conducted the search was "particularly offensive" in comparison with other lawful border searches. According to Arnold, the CBP officers simply "had me boot [the laptop] up, and looked at what I had inside . . . ."

[8] Whatever "particularly offensive manner" might mean, this search certainly does not meet that test. Arnold has failed to distinguish how the search of his laptop and its electronic contents is logically any different from the suspicionless border searches of travelers' luggage that the Supreme Court and we have allowed. *See Ross*, 456 U.S. at 823; *see also Vance*, 62 F.3d at 1156 ("In a border search, a person is subject to search of luggage, contents of pockets and purse without any suspicion at all.").

[9] With respect to these searches, the Supreme Court has refused to draw distinctions between containers of information and contraband with respect to their quality or nature for purposes of determining the appropriate level of Fourth Amendment protection. Arnold's analogy to a search of a home based on a laptop's storage capacity is without merit. The Supreme Court has expressly rejected applying the

---

[2]Notwithstanding the government's objection, we can decide this issue because the "particularly offensive manner" exception can be found in *Flores-Montano*, which was presented to the district court by the parties, and "the matter [of what the Fourth Amendment requires] was fairly before the [district court]" and, in any event, it is a question of law. *See Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469-70 (2000); *see also Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 908 (9th Cir. 2004) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise argument they made below. . . . Where . . . the question presented is one of law, we consider it in light of all relevant authority, regardless of whether such authority was properly presented in the district court." (citations and quotation marks omitted)).

Fourth Amendment protections afforded to homes to property which is "*capable of functioning as a home*" simply due to its size, or, distinguishing between " 'worthy and 'unworthy' containers." *California v. Carney*, 471 U.S. 386, 393-94 (1985).

In *Carney*, the Supreme Court rejected the argument that evidence obtained from a warrantless search of a mobile home should be suppressed because it was "*capable of functioning as a home.*" *Id*. at 387-88, 393-94. The Supreme Court refused to treat a mobile home differently from other vehicles just because it could be used as a home. *Id.* at 394-95. The two main reasons that the Court gave in support of its holding, were: (1) that a mobile home is "readily movable," and (2) that "the expectation [of privacy] with respect to one's automobile is significantly less than that relating to one's home or office." *Id.* at 391 (quotation marks omitted).

**[10]** Here, beyond the simple fact that one cannot live in a laptop, *Carney* militates against the proposition that a laptop is a home. First, as Arnold himself admits, a laptop goes with the person, and, therefore is "readily mobile." *Carney*, 471 U.S. at 391. Second, one's "expectation of privacy [at the border] . . . is significantly less than that relating to one's home or office." *Id.*

Moreover, case law does not support a finding that a search which occurs in an otherwise ordinary manner, is "particularly offensive" simply due to the storage capacity of the object being searched. *See California v. Acevedo*, 500 U.S. 565, 576 (1991) (refusing to find that "looking inside a closed container" when already properly searching a car was unreasonable when the Court had previously found "destroying the interior of an automobile" to be reasonable in *Carroll v. United States*, 267 U.S. 132 (1925)).

**[11]** Because there is no basis in the record to support the contention that the manner in which the search occurred was

"particularly offensive" in light of other searches allowed by the Supreme Court and our precedents, the district court's judgment cannot be sustained.

V

Finally, despite Arnold's arguments to the contrary we are unpersuaded that we should create a split with the Fourth Circuit's decision in *Ickes*. In that case, the defendant was stopped by Customs agents as he attempted to drive his van from Canada into the United States. 393 F.3d at 502. Upon a "cursory search" of defendant's van, the inspecting agent discovered a video camera containing a tape of a tennis match which "focused excessively on a young ball boy." *Id*. This prompted a more thorough examination of the vehicle, which uncovered several photograph albums depicting provocatively-posed prepubescent boys, most nude or seminude. *Id.* at 503.

The Fourth Circuit held that the warrantless search of defendant's van was permissible under the border search doctrine. The court refused to carve out a First Amendment exception to that doctrine because such a rule would: (1) protect terrorist communications "which are inherently 'expressive' "; (2) create an unworkable standard for government agents who "would have to decide—on their feet—which expressive material is covered by the First Amendment"; and (3) contravene the weight of Supreme Court precedent refusing to subject government action to greater scrutiny with respect to the Fourth Amendment when an alleged First Amendment interest is also at stake. *See id.* at 506-08 (citing *New York v. P.J. Video*, 475 U.S. 868, 874 (1986) (refusing to require a higher standard of probable cause for warrant applications when expressive material is involved)).

We are persuaded by the analysis of our sister circuit and will follow the reasoning of *Ickes* in this case.

## VI

For the foregoing reasons, the district court's decision to grant Arnold's motion to suppress must be

**REVERSED.**