B. FLETCHER, Circuit Judge,
dissenting:
I respectfully dissent. The “sticking point” of this case is not whether the Government’s authority “to subject incoming travelers to inspection for entry also permits the Government to transport property not yet cleared for entry away from the border to complete its search.” Maj. Op. at 1076. The real issue, as this case is framed by the government and the majority, is whether the Government has authority to seize an individual’s property in order to conduct an exhaustive search that takes days, weeks, or even months, with no reason to suspect that the property contains contraband.[1] In other words, the problem with this case is not that the Government searched Cotterman’s computer in Tucson as opposed to Lukeville. The problem is that the Government seized Cotterman’s laptop so it could conduct a computer forensic search, a time consuming and tremendously invasive process, without any particularized suspicion whatsoever.
To the contrary, I would hold that officers must have some level of particularized suspicion in order to conduct a seizure and search like the one at issue here, because (1) seizing one’s personal property deprives the individual of his valid possessory interest in his property, and (2) authorizing a generalized computer forensic search (untethered to any particularized suspicion) permits the Government to engage in the type of generalized fishing expeditions that the Fourth Amendment is designed to prevent.
The “touchstone” of our Fourth Amendment analysis, even at the border, must be reasonableness, but with recognition that the “Fourth Amendment’s balance of reasonableness is qualitatively different at the international border than in the interior.” United States v. Montoya de Hernandez, 473 U.S. 531, 538, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). “Balanced against the sovereign’s interests at the border are the Fourth Amendment rights of.... [the individual, who is] entitled to be free from unreasonable search and seizure.” Id. at 539, 105 S.Ct. 3304.
The Supreme Court has recognized that a traveler has a Fourth Amendment interest in maintaining possession of his personal property. In United States v. Place, 462 U.S. 696, 708, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Court explained that “detention of luggage within the trav *1085 eler’s immediate possession ... intrudes on both the suspect’s possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary.” Those interests exist, albeit with less force, at the border. See, e.g., United States v. Flores-Montano, 541 U.S. 149, 155, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004).[2] While a traveler cannot have a reasonable expectation that his property will not be searched at the border,[3] I submit that a traveler does have a reasonable expectation that his property will not be searched in a manner that requires it to be taken away from him for weeks or months, unless there is some basis for the Government to believe that the property contains contraband. Cf. United States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 376, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) (A traveler’s “right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered during such a search”) (emphasis added).
The majority appears to recognize that border searches “conducted in a partieularly offensive manner” run afoul of the Fourth Amendment. Maj. Op. at 1079-80, 1080. In considering whether this search was particularly offensive, the majority focuses on the efficiency of Government officials performing the search and on the necessity of transport. Maj. Op. at 1080-81. No one disputes that the CBP officers in this case were diligent. The majority fails, however, to substantively analyze the nature of the search itself, and so overlooks the fact that computer forensic searches are highly invasive, and a computer forensic search unlimited by any suspicion of particular criminal activity even more so.
Computers store libraries worth of personal information, including substantial amounts of data that the user never intended to save and of which he is likely completely unaware (for example, browsing histories and records of deleted files in unallocated space). See United States v. Flyer, 633 F.3d 911, 913, 918-19 (9th Cir. 2011); United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162, 1176 (9th Cir.2010) (en banc). Computers offer “windows into [our] lives far beyond any *1086 thing that could be, or would be, stuffed into a suitcase for a trip abroad.” David K. Shipler, Can You Frisk a Hard Drive?, N.Y. TIMES, Feb. 20, 2011, at WK5. The majority gives the Government a free pass to copy, review, categorize, and even read all of that information in the hope that it will find some evidence of any crime.
An exceptionally invasive search of property can constitute a search conducted in a particularly offensive manner. See United States v. Ramsey, 431 U.S. 606, 618 n. 13, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977) (reserving the question of whether a search at the border conducted in a particularly offensive manner violates the Constitution); Kremen v. United States, 353 U.S. 346, 347, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957) (holding unconstitutional a search where officers with a warrant to arrest two individuals transported the entire contents of a home to San Francisco for an “exhaustive” search); Go-Bart Importing Co. v. United States, 282 U.S. 344, 356-58, 51 S.Ct. 153, 75 L.Ed. 374 (1931) (holding unconstitutional a search where officers with a warrant to arrest individuals seized office papers, under threat of force, in order to conduct a “general exploratory search in the hope that evidence of a crime might be found”), abrogated on other grounds as discussed in Arizona v. Gant, — U.S. ---, 129 S.Ct. 1710, 1724, 173 L.Ed.2d 485 (2009)[4] Given the exhaustive nature of computer forensic searches, I would hold that such searches are “conducted in a particularly offensive manner” unless they are guided by an officer’s reasonable suspicion that the computer contains evidence of a particular crime.
The majority purports to limit the Government’s authority, stating that courts will continue to consider “whether a detention remained ‘reasonably related in scope to the circumstances which justified it.’” Maj. Op. at 1082, citing Montoya de Hernandez, 473 U.S. at 542, 105 S.Ct. 3304. This begs the question — what circumstances justify the seizure and search? In Montoya de Hernandez, the Government had reasonable suspicion that the traveler was smuggling drugs in her alimentary canal; therefore, the detention was reasonable, but only for as long as required to determine that the traveler was or was not smuggling drugs. See 473 U.S. at 542-44, 105 S.Ct. 3304. Here, the majority authorizes seizure of personal property to permit the Government to “fully allay its concerns” about the property. Maj. Op. at 1077. In a search designed to fully allay the Government’s concerns, the scope of the search will be determined by the Government’s desire to be thorough,[5] and the length of the seizure by the Government’s convenience.[6] The majority essentially al *1087 lows the Government to set its own limits — surely the Fourth Amendment demands more.
I add my voice to the chorus lamenting the apparent demise of the Fourth Amendment. See, e.g., United States v. Pineda-Moreno, 617 F.3d 1120, 1121 (9th Cir.2010) (Kozinski, J., in a dissent from denial of rehearing en banc joined by Reinhardt, Wardlaw, Paez and Berzon); United States v. Seljan, 547 F.3d 993, 1014-19 (9th Cir.2008) (en bane) (Kozinski, J., dissenting). I dissent.

. I do not assume, as does the majority, that Customs and Border Protection officers lacked reasonable suspicion to seize Cotter-man's laptop. Op. at 1073-74. On appeal, the Government abandoned its argument before the district court that officers had reasonable suspicion that Cotterman's laptop contained child pornography on account of (1) Cotterman’s prior conviction for a child-related sex-offense; (2) the presence of password protected files on Cotterman’s computer; and el the fact that Cotterman was returning from a lengthy trip to Mexico. Accordingly, I express no view on the presence of reasonable suspicion. I suspect, though, that the Government’s decision not to appeal the district court’s adverse ruling on reasonable suspicion stems in part from its eagerness to secure our sweeping approval of suspicionless border seizure and search of electronics equipment. See United States v. Chaudhry, 424 F.3d 1051, 1054 (9th Cir.2005) (B. Fletcher, J., specially concurring).

. I disagree with the majority's conclusion that Flores-Montano permits as "routine” all property deprivations at the border that are not highly destructive or offensive. See Maj. Op at 1075 n. 9 ("[P]roperty deprivation at the border remains routine regardless of the ‘degree of instrusiveness’ of a search.... Only highly destructive or offensive property searches may suffice to render a deprivation non-routine.”). Flores-Montano considered whether the disassembly and reassembly of a gas tank was permissible at the border. 541 U.S. at 151, 124 S.Ct. 1582. The Court recognized that such a procedure interfered with a motorist’s possessory interest in his property, but concluded that the degree of interference caused by a "brief procedure that can be reversed without damaging the safety or operation of the vehicle” was justified by the Government’s interest in protecting the border. 541 U.S. at 155, 124 S.Ct. 1582. FloresMontano did not address the situation at issue here: whether, without reasonable suspicion, a total deprivation of the traveler’s possessory interests for an indefinite period is permissible.

. As the majority acknowledges, United States v. Arnold, 533 F.3d 1003, 1008 (9th Cir.2008) does not control. Op. at 1082-83. Though Arnold held that "reasonable suspicion is not needed for customs officials to search a laptop or other personal electronic storage devices at the border,” it did not involve the type of search and seizure at issue here. Id. at 1008. In Arnold, officials at the border examined the visible files on the computer and found child pornography. Id. at 1005. Notably, the officers did not seize the computer for an indefinite period until after they identified contraband, and they obtained a warrant before conducting an exhaustive forensic search of all the computer’s data. Id.

. Kremen and Go-Bart do not involve border searches. Nevertheless, the Supreme Court cited both cases in Ramsey as support for the proposition that a search at the border conducted in a particularly offensive manner would violate the Fourth Amendment. 431 U.S. at 618 n. 3, 97 S.Ct. 1972.

. The Government could seek to ensure that there is no child pornography or information about terrorist plots on the computer. But it could also translate any documents in a foreign language, ensure that none of the seemingly innocuous pictures are actually encrypted messages, verify the licenses on any music or movies on the computer, review financial logs for evidence of insider trading, read email correspondence to ensure that there is no communication with known criminals— the list of possible "concerns” is endless, particularly where the Government expressly seeks to use its border search power to uncover evidence of crimes unrelated to contraband smuggling or national security. See United States Customs and Border Protection Directive No. 3340-049, August 20, 2009.

. The majority suggests that conducting a forensic search in a distant lab is faster than or equivalent to conducting a search at the border. Maj. Op. at 1083. That misses the point. A computer search in a forensic lab *1087 will always be equivalent to an identical search at the border. The duration of a computer search is not controlled by where the search is conducted. The duration of a computer search is controlled by what one is looking for and how one goes about searching for it. See Orín S. Kerr, Searches and Seizures in a Digital World, 119 Harv.L.Rev. 531, 544 (2005) (''[A]nalysis of a computer hard drive takes as much time as the analyst has to give it.”).