*971 CALLAHAN, Circuit Judge,
concurring in part, dissenting in part, and concurring in the judgment, with whom CLIFTON, Circuit Judge, joins, and with whom M. SMITH, Circuit Judge, joins as to all but Part II.A:
Whether it is drugs, bombs, or child pornography, we charge our government with finding and excluding any and all illegal and unwanted articles and people before they cross our international borders. Accomplishing that Herculean task requires that the government be mostly free from the Fourth Amendment’s usual restraints on searches of people and their property. Today the majority ignores that reality by erecting a new rule requiring reasonable suspicion for any thorough search of electronic devices entering the United States. This rule flouts more than a century of Supreme Court precedent, is unworkable and unnecessary, and will severely hamstring the government’s ability to protect our borders.
I therefore dissent from Part III of the majority’s opinion. I concur in Parts I, II, and IV, and in particular the majority’s conclusion in Part IV that the government had reasonable suspicion to conduct the forensic examination of Howard Cotter-man’s electronic devices. I therefore also concur in the judgment.
I.
Over the last 125 years, the Supreme Court has explained that the United States and its people have a “paramount interest” in national self-protection and an “inherent” right to exclude illegal and “unwanted persons and effects.” United States v. Flores-Montano, 541 U.S. 149, 152-53, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004); see also United States v. Montoya de Hernandez, 473 U.S. 531, 537-40, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); United States v. Ramsey, 431 U.S. 606, 616-18, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); United States v. Thirty-Seven (37) Photographs, 402 U.S. 363, 376, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); Carroll v. United States, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Boyd v. United States, 116 U.S. 616, 623, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Accordingly, “[t]he Government’s interest in preventing the entry of unwanted persons and effects is at its zenith at the international border.” Flores-Montano, 541 U.S. at 152, 124 S.Ct. 1582.
To effectuate this interest, the Supreme Court has recognized a broad exception to the Fourth Amendment’s requirement of probable cause or a warrant for searches conducted at the border. Under that exception, searches of people and their property at the United States borders and their functional equivalents are per se reasonable, meaning that they typically do not require a warrant, probable cause, or even reasonable suspicion. Montoya de Hernandez, 473 U.S. at 538, 105 S.Ct. 3304; see also Flores-Montano, 541 U.S. at 152-53, 124 S.Ct. 1582; Ramsey, 431 U.S. at 616-18, 97 S.Ct. 1972; United States v. Seljan, 547 F.3d 993, 999-1000 (9th Cir. 2008) (en banc), cert. denied, 555 U.S. 1195, 129 S.Ct. 1368, 173 L.Ed.2d 627 (2009).
In the long time that the Court has recognized the border search doctrine, the Court has found just one search at the border that required reasonable suspicion. See Montoya de Hernandez, 473 U.S. at 541, 105 S.Ct. 3304 (upholding the 24-hour detention of a woman suspected of smuggling illegal drugs in her digestive system, followed by a pregnancy test and rectal examination, based on reasonable suspicion). In the remaining cases, the Court consistently has described the govern *972 ment’s border search authority in very broad terms[1] and overturned the lower courts’ attempts to cabin that authority.[2] The Court also repeatedly has gone out of its way to explain that border searches generally are exempt from the limits it imposes on domestic searches. See, e.g., Flores-Montano, 541 U.S. at 154, 124 S.Ct. 1582 (“[0]n many occasions, we have noted that the expectation of privacy is less at the border than it is in the interior.”); Montoya de Hernandez, 473 U.S. at 539-40, 105 S.Ct. 3304 (“But not only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border.” (internal and external citations omitted)); United States v. 12 200-Foot Reels of Super 8mm. Film, 413 U.S. 123, 125, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973) (“Import restrictions and searches of persons or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations.”).[3]
*973 II.
It is against this legal backdrop that we must assess the constitutionality of the government’s search in this case. As with all searches subject to Fourth Amendment review, the constitutionality of a border search turns on whether it is reasonable. See Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) (“[T]he ultimate touchstone of the Fourth Amendment is ‘reasonableness.’ ”). Under the border search doctrine, suspicionless border searches are per se reasonable. However, the Supreme Court has identified three situations in which they might not be per se reasonable, ie., at least reasonable suspicion is required: (1) “highly intrusive searches of the person;” (2) destructive searches of property; and (3) searches conducted in a “particularly offensive” manner. FloresMontano, 541 U.S. at 152-56 & n. 2, 124 S.Ct. 1582.
Although its opinion is not entirely clear, the majority appears to rely on the first and third exceptions to hold that the search at issue in this case required reasonable suspicion. (There is no claim that the government damaged or destroyed Cotterman’s property.) But the exception for “highly intrusive searches of the person,” Flores-Montano, 541 U.S. at 152, 124 S.Ct. 1582, cannot apply here; “papers,” even private ones in electronic format, are not a “person.” See id. (“The reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person — dignity and privacy interests of the person being searched — simply do not carry over to vehicles.”). That leaves the exception for searches conducted in a “particularly offensive” manner. Id. at 154 n. 2, 124 S.Ct. 1582. The majority relies primarily on the notion that electronic devices are special to conclude that reasonable suspicion was required. Majority at 963-68. The majority is mistaken.
A.
The majority correctly concludes that the government’s forensic search in Tucson was not an extended border search, as the border agents retained custody of Cotterman’s laptop.[4] Id. at 958, 960-61. The majority also states that “[i]t is the comprehensive and intrusive nature of a forensic examination — not the location of the *974 examination — that is the key factor triggering the requirement of reasonable suspicion here.” Majority at 962. The inclusion of the word “key” might be read to imply that some other factor, such as the location and duration of the search, contributed to its purported unreasonableness. I write to refute any such notion.
First consider the facts. The border agents took Cotterman’s electronic devices to the nearest computing center (to Tucson, where Cotterman and his wife were already traveling), before clearing them for entry into the United States. The computer specialist moved the search ahead of his other work and conducted it over the weekend. Although the forensic search lasted five days, it took only 48 hours to discover the initial 75 images of child pornography. The agents were reasonably reluctant to rely on Cotterman’s offer to help, since he might have deleted or otherwise made unrecoverable any contraband that his devices contained. The agents returned the devices as soon as they cleared them.
Now consider the law. The Supreme Court has upheld the constitutionality of a police search of packages retrieved from an automobile, even though the police conducted their search three days after the police stopped the vehicle and at the police station. United States v. Johns, 469 U.S. 478, 485-88, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985). The Court rejected the argument that “searches of containers discovered in the course of a vehicle search are subject to temporal restrictions not applicable to the vehicle search itself.” Id. at 485, 105 S.Ct. 881. Although Johns involved a domestic automobile search based on probable cause, it still stands for the proposition, equally applicable to this case, that “the legality of the search was determined by reference to the [applicable] exception to the warrant requirement.” Id.
In the border search context, the Supreme Court, in upholding the lengthy detention of a person reasonably suspected of smuggling drugs in her digestive system at an airport, addressed whether that detention was “reasonably related in scope to the circumstances which justified it initially.” Montoya de Hernandez, 473 U.S. at 542, 105 S.Ct. 3304. The Court explained that: (1) “courts should not indulge in unrealistic second-guessing” when answering this question, as “Authorities must be allowed to graduate their response to the demands of any particular situation;” (2) the Court consistently has “refused to charge police with delays in investigatory detention attributable to the suspect’s evasive actions;” and (3) “we have also consistently rejected hard-and-fast time limits.” Id. at 542-43, 105 S.Ct. 3304 (quotation marks and citations omitted). The Court emphasized that, at the international border, “the Fourth Amendment balance of interests leans heavily to the Government” because the government is charged not just with investigating crime but with “protecting this Nation from entrants who may bring anything harmful into this country.” Id. at 544, 105 S.Ct. 3304. Finally, any “length” or “discomfort” associated with a border search does not offend the Fourth Amendment when it “result[s] solely from the method by which [a traveler] cho[oses] to smuggle [contraband] into this country.” Id.
Any suggestion that the government’s search here was “particularly offensive” due to the location and duration of the search runs counter to the Supreme Court’s admonitions in Johns and Montoya de Hernandez. It also effectively requires the government to supply every port of entry with the equipment and staff needed to conduct forensic electronic searches, or at least to have such equipment and staff waiting at a nearby loca *975 tion. Such a requirement is unreasonable, particularly since the record in this case suggests that a forensic search of Cotter-man’s electronic devices at the border station would have taken longer than the search at the Tucson computing center.[5] See United States v. Hill, 459 F.3d 966, 974-75 (9th Cir.2006), cert. denied, 549 U.S. 1299, 127 S.Ct. 1863, 167 L.Ed.2d 353 (2007) (discussing problems inherent in requiring police to bring with them equipment to search electronic media); cf. Johns, 469 U.S. at 486-87, 105 S.Ct. 881 (explaining that requiring police officers to immediately inspect all packages “would be of little benefit to the person whose property is searched”).
B.
The majority’s opinion turns primarily on the notion that electronic devices deserve special consideration because they are ubiquitous and can store vast quantities of personal information. That idea is fallacious and has no place in the border search context.
The Supreme Court has been willing to distinguish only between border searches of people and property, not between different types of property. In 2004, in FloresMontano, the Court explained that
the reasons that might support a requirement of some level of suspicion in the case of highly intrusive searches of the person — dignity and privacy interests of the person being searched — simply do not carry over to vehicles. Complex balancing tests to determine what is a “routine” search of a vehicle, as opposed to a more “intrusive” search of a person, have no place in border searches of vehicles.
541 U.S. at 152, 124 S.Ct. 1582. We have since applied Flores-Montano to hold that any distinction between “routine” and “nonroutine” searches does not apply to searches of property, and that there can be no “least restrictive means” test for border searches. United States v. Chaudhry, 424 F.3d 1051, 1054 (9th Cir.2005), cert. denied, 547 U.S. 1083, 126 S.Ct. 1803, 164 L.Ed.2d 540 (2006); United States v. Cortez-Rocha, 394 F.3d 1115, 1122-23 (9th Cir.2004), cert. denied, 546 U.S. 849, 126 S.Ct. 105, 163 L.Ed.2d 118 (2005).[6] Put another way, the Supreme Court — and, reluctantly, this court — have refused to *976 adopt a sliding “intrusiveness” scale for border searches of property. Thus, the Court has all but held that property that crosses the border, whatever it is, does not merit Fourth Amendment protection.
Of course, Flores-Montano, Chaudhry, and Cortez-Rocha involved vehicles or parts of vehicles, not electronic devices, and the other border search cases that have reached the Supreme Court all involved containers of some sort. See, e.g., Ramsey, 431 U.S. at 616-22, 97 S.Ct. 1972 (mail); Thirty-Seven (37) Photographs, 402 U.S. at 376, 91 S.Ct. 1400 (luggage). And yes, the Court has left open the possibility that a border search might be “ ‘ “unreasonable” because of the particularly offensive manner in which it is carried out.’” Flores-Montano, 541 U.S. at 154 n. 2, 124 S.Ct. 1582 (quoting Ramsey, 431 U.S. at 618 n. 13, 97 S.Ct. 1972). But is the mere fact that Cotterman chose to save his child pornography electronically, rather than print it out on paper, enough to invoke that exception?
The two courts of appeals — including this court — that have had occasion to address whether electronic devices deserve special consideration have correctly concluded that they do not. In United States v. Arnold, 533 F.3d 1003, 1008-10 (9th Cir.2008), cert. denied, 555 U.S. 1176, 129 S.Ct. 1312, 173 L.Ed.2d 595 (2009), we held that laptops are like other property, relying on the reasoning and language in Flores-Montano, Chaudhry, and Cortez-Rocha discussed above (among other cases). Similarly, in United States v. Ickes, 393 F.3d 501, 503-07 (4th Cir.2005), the Fourth Circuit upheld an extensive border search of the defendant’s laptop that revealed child pornography. Notably, the court held that the border agents had reasonable suspicion to search the defendant’s laptop, but explained why that did not matter:
The agents did not inspect the contents of Ickes’s computer until they had already discovered marijuana paraphernalia, photo albums of child pornography, a disturbing video focused on a young ball boy, and an outstanding warrant for Ickes’s arrest. As a practical matter, computer searches are most likely to occur where — as here — the traveler’s conduct or the presence of other items in his possession suggest the need to search further. However, to state the probability that reasonable suspicions will give rise to more intrusive searches is a far cry from enthroning this notion as a matter of constitutional law. The essence of border search doctrine is a reliance upon the trained observations and judgments of customs officials, rather than upon constitutional requirements applied to the inapposite context of this sort of search.
Id. at 507. Thus, the Fourth Circuit has recognized what the majority does not: electronic devices are like any other container that the Supreme Court has held may be searched at the border without reasonable suspicion.[7] Though we are not bound by Arnold nor Ickes in this en banc proceeding, we are bound by what the Supreme Court has said: in the unique context of border searches, property is property and we may not chip away at the government’s authority to search it by adopting a sliding scale of intrusiveness. It’s the border, not the technology, that “matters.” Majority at 965; cf. Ramsey, 431 U.S. at 620, 97 S.Ct. 1972 (“It is clear that there is nothing in the rationale behind the border-search exception which *977 suggests that the mode of entry will be critical.”).
Logic and commonsense, not just Supreme Court precedent, reveal the flaws in the majority’s opinion. The fact that electronic devices are capable of storing a lot of personal information does not make an extensive search of them “particularly offensive.” We have squarely rejected the idea that the “intrusiveness” of a search depends in whole or in part on the nature of the property being searched. In United States v. Giberson, 527 F.3d 882 (9th Cir.2008), we specifically rebuffed the argument that computers are special for Fourth Amendment purposes by virtue of how much information they store; “neither the quantity of information, nor the form in which it is stored, is legally relevant in the Fourth Amendment context.” Id. at 888; see also California v. Carney, 471 U.S. 386, 393-94, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) (rejecting applying Fourth Amendment protection to property (a mobile home) that is “capable of functioning as a home” simply on account of the property’s size or “worthfiness]” as a container); United States v. Payton, 573 F.3d 859, 864 (9th Cir.2009) (“Giberson held that computers were not entitled to a special categorical protection of the Fourth Amendment.”); Kyllo v. United States, 533 U.S. 27, 41, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (Stevens, J., dissenting) (explaining that Fourth Amendment exceptions and distinctions based solely on a type of technology are “unwise[ ] and inconsistent with the Fourth Amendment”).
While Giberson and Carney involved domestic searches, their reasoning applies equally in the border search context. If the government may search the contents of a briefcase, car, or mobile home that transits the border, there is no reason it should not also be able to search the contents of a camera, tablet, or laptop that enters the country. All of those things are capable of storing, and often do store, private information. See Ross, 456 U.S. at 823, 102 S.Ct. 2157 (“The luggage carried by a traveler entering the country may be searched at random by a customs officer; the luggage may be searched no matter how great the traveler’s desire to conceal the contents may be.” (emphasis added)). The majority points out that electronic devices can and usually do store much more private information than their non-electronic counterparts. Majority at 962-65. But “a port of entry is not a traveler’s home,” Thirty-Seven (37) Photographs, 402 U.S. at 376, 91 S.Ct. 1400, even if a traveler chooses to carry a home’s worth of personal information across it.[8] Moreover, a bright-line rule distinguishing electronic from non-electronic devices — of the *978 sort the Supreme Court has made clear has no place in Fourth Amendment jurisprudence, Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)— is arbitrary; there is no reason someone carrying a laptop should receive greater privacy protection than someone who chooses (or can only afford) to convey his or her personal information on paper.
In short, today the court erects a new bright-line rule: “forensic examination” of electronic devices “at the border requires reasonable suspicion.” Majority at 962; see also id. at 964 n. 10. The majority never defines “forensic,” leaving border agents to wonder exactly what types of searches are off-limits.[9] Even if the majority means to require reasonable suspicion for any type of digital forensic border search, no court has ever erected so categorical a rule, based on so general a type of search or category of property, and the Supreme Court has rightly slapped down anything remotely similar. The majority invites — indeed, requires — the Court to do so again.[10]
III.
The majority’s holding contravenes Supreme Court precedent, defies logic and commonsense, and is unworkable. It is also unnecessary and will impair the federal government’s ability to protect our borders.
As Judge Smith points out in his dissent, “[bjorder patrol agents process hundreds of thousands of travelers each day and conduct thousands of searches on electronic devices each year.” Dissent at 61-62 (citation omitted). All the evidence in this case suggests that the government does not have the resources — time, personnel, facilities, or technology — to exhaustively search every (or even a majority) of the electronic devices that cross our borders. Cf. Ickes, 393 F.3d at 507. Unless we somehow manage to solve our fiscal problems, and unless the government somehow manages to acquire better technology at a faster pace than the rest of us, these restraints will continue. That means border agents must prioritize who, what, and how they search. By and large, border agents will conduct forensic electronic searches of people who, like Howard Cotterman, the agents reasonably suspect may be trying to carry illegal articles into, or themselves illegally enter, the country.[11] That agents typically will have reasonable suspicion is, *979 of course, “a far cry from enthroning this notion as a matter of constitutional law.” Ickes, 393 F.3d at 507.
The majority finds this reality check to be of “little comfort[;] [i]t is the potential unfettered dragnet effect that is troublesome.” Majority at 966. But that abstract risk, which exists with any exception to the Fourth Amendment, does not justify a bright-line rule requiring reasonable suspicion for any thorough search of electronic devices entering the United States. See Robinette, 519 U.S. at 39, 117 S.Ct. 417 (“[W]e have consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry.”); see also Lyng v. Nw. Indian Cemetery Protective Ass’n, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (“A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them”).
Moreover, border agents are not free to undertake “unfettered crime-fighting searches or an unregulated assault on citizens’ private information.” Majority at 966. As I explained in my concurrence in Seljan, Congress and the Executive Branch have (and have exercised) the authority to restrict when and how border agents conduct searches. See Seljan, 547 F.3d at 1012 (Callahan, J., concurring) (citing, e.g., 19 U.S.C. § 1583; 19 C.F.R. § 145.3(b)-(c)); see also Yule Kim, Cong. Research Serv. RL34404, Border Searches of Laptop Computers and Other Electronic Storage Devices, 13-14 (2009) (describing recent legislative proposals to limit border searches of electronic devices). In a similar vein, Justice Breyer has noted that “Customs keeps track of the border searches its agents conduct, including the reasons for the searches. This administrative process should help minimize concerns that [border] searches might be undertaken in an abusive manner.” FloresMontano, 541 U.S. at 156, 124 S.Ct. 1582 (Breyer, J., concurring) (internal citation omitted).[12]
Apart from being unnecessary, the majority’s new limits on the government’s border search authority will make it much harder for border agents to do their jobs, for at least two reasons. First, it is common knowledge that border agents at security checkpoints conduct more thorough searches not simply of those persons who arouse suspicion but also of a percentage of travelers on a random basis. Otherwise, a person who appears entirely innocent will have nothing to fear and will not be deterred from carrying something that should not be brought into the country. A checkpoint limited to searches that can be justified by articulable grounds for “reasonable suspicion” is bound to be less effective.
Second, courtesy of the majority’s decision, criminals now know they can hide their child pornography or terrorist connections in the recesses of their electronic devices, while border agents, fearing Fourth Amendment or Bivens actions, will avoid conducting the searches that could find those illegal articles. The re- *980 suit will be that people and things we wish to keep out of our country will get in — a result hardly in keeping with our “inherent authority to protect, and a paramount interest in protecting,” the “territorial integrity” of the United States. Flores-Montano, 541 U.S. at 153, 124 S.Ct. 1582. The border search doctrine must account for the fact that border agents may need time and forensics to bypass “evasive actions” a criminal has taken to hide contraband or other illegal articles from plain view. Montoya de Hernandez, 473 U.S. at 542-43, 105 S.Ct. 3304. I would rather leave those difficult decisions “to the discretion of the officers in the field who confront myriad circumstances we can only begin to imagine from the relative safety of our chambers.” United States v. Williams, 419 F.3d 1029, 1034 (9th Cir.), cert. denied, 546 U.S. 1081, 126 S.Ct. 840, 163 L.Ed.2d 715 (2005).[13]
IV.
The border search exception to the Fourth Amendment may be just that — an exception — but it is, and must be, a mighty one. The government’s right and duty to protect our nation’s territorial integrity demand that the government have clear authority to exclude — and thus to find— those people and things we have decided are offensive, threatening, or otherwise unwanted. Recognizing this, the Supreme Court has only once required reasonable suspicion for border searches in the 125 years it has been reviewing them. In the remaining cases, the Court has eschewed bright-line rules, balancing tests, and sliding intrusiveness scales, alluding to the possibility of, but never finding, a “particularly offensive” search. The fact that electronic devices can store large amounts of private information, or that the government can search them forensically, does not make a thorough search of such devices “particularly offensive.” Rather, the Supreme Court and this court have wisely avoided making the reasonableness of a search turn on the nature of the property being searched, for the many reasons discussed above. The result has been a clear, well-understood, efficient, and effective rule that border searches are per se reasonable.
Regrettably the majority, dispensing with these well-settled, sensible, and binding principles, lifts our anchor and charts a course for muddy waters. Now border agents, instead of knowing that they may search any and all property that crosses the border for illegal articles, must ponder whether their searches are sufficiently “comprehensive and intrusive,” Majority at 962, to require reasonable suspicion, and whether they have such suspicion. In *981 most cases the answer is going to be as clear as, well, mud. We’re due for another course correction.

.See, e.g., Flores-Montano, 541 U.S. at 152, 124 S.Ct. 1582 ("The Government’s interest in preventing the entry of unwanted persons and effects is at its zenith at the international border.”); id. at 153, 124 S.Ct. 1582 ("It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity.”); Ramsey, 431 U.S. at 617, 97 S.Ct. 1972 ("This interpretation, that border searches were not subject to the warrant provisions of the Fourth Amendment and were 'reasonable' within the meaning of that Amendment, has been faithfully adhered to by this Court.”); id. at 620, 97 S.Ct. 1972 ("The border-search exception is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may enter the country.”); Thirty-Seven (37) Photographs, 402 U.S. at 376, 91 S.Ct. 1400 ("[A traveler's] right to be let alone neither prevents the search of his luggage nor the seizure of unprotected, but illegal, materials when his possession of them is discovered during such a search. Customs officers characteristically inspect luggage and their power to do so is not questioned in this case; it is an old practice and is intimately associated with excluding illegal articles from the country.”); Carroll, 267 U.S. at 154, 45 S.Ct. 280 ("Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.”). Even in Montoya de Hernandez the Court described the government's border search authority expansively. See 473 U.S. at 539-40, 542-44, 105 S.Ct. 3304.

. See, e.g., Flores-Montano, 541 U.S. at 152— 55, 124 S.Ct. 1582 (overturning the Ninth Circuit's conclusion that the border search of a gas tank required reasonable suspicion); Ramsey, 431 U.S. at 616-22, 97 S.Ct. 1972 (overturning the D.C. Circuit’s conclusion that the search of international mail required probable cause); Thirty-Seven (37) Photographs, 402 U.S. at 376, 91 S.Ct. 1400 (relying in part on border search doctrine to overturn lower court’s decision that statute barring the importation of obscene material was unconstitutional).

. See also City of Indianapolis v. Edmond, 531 U.S. 32, 47-48, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (explaining that decision barring domestic drug interdiction checkpoints "does not affect the validity of border searches or searches at places like airports”); United States v. Ross, 456 U.S. 798, 823, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (explaining that while the Fourth Amendment gives protection to containers in domestic vehicles, "[t]he luggage carried by a traveler entering the country may be searched at random by a customs officer”); Torres v. Puerto Rico, 442 U.S. 465, 472-74, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979) (distinguishing between United States-Puerto Rico border and international borders in holding unconstitutional the search of a traveler's luggage without "articulable suspicion”); United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) ("Except at the border and its functional equivalents, officers on roving patrol may stop vehicles” only with reasonable suspicion they contain illegal aliens); Almeida-Sanchez v. United States, 413 U.S. 266, 272-76, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) *973 (distinguishing searches of vehicles at the border from a search that occurred 25 miles away); Carroll, 267 U.S. at 151-54, 45 S.Ct. 280 (distinguishing between interior and border searches of vehicles and persons).

. I agree with the majority that this case does not involve an extended border search. Unlike a border search, an extended border search takes place at a location "away from the border where entry is not apparent, but where the dual requirements of reasonable certainty of a recent border crossing and reasonable suspicion of criminal activity are satisfied.” United States v. Guzman-Padilla, 573 F.3d 865, 878-79 (9th Cir.2009) (internal quotation marks and citation omitted), cert. denied, -U.S. -, 131 S.Ct. 67, 178 L.Ed.2d 245 (2010). Reasonable suspicion is required precisely because the individual has regained an expectation of privacy by moving away from the border. See United States v. Villasenor, 608 F.3d 467, 471-72 (9th Cir.), cert. denied, - U.S. -, 131 S.Ct. 547, 178 L.Ed.2d 401 (2010); United States v. Whiting, 781 F.2d 692, 695 (9th Cir.1986). Here, there was no attenuation between Cotter-man's border crossing and the forensic search of his electronic property; the government conducted that search before clearing the property for entry and before Cotterman could regain an expectation of privacy in that property. See 19 U.S.C. § 1499 (providing that imported goods are permitted entry only after Customs clears them); United States v. Alfonso, 759 F.2d 728, 734 (9th Cir.1985) ("Extended border searches occur after the actual entry has been effected and intrude more on an individual's normal expectation of privacy.").

. The district court found that the government could have conducted the forensic search at the Lukeville border station. United States v. Cotterman, No. CR 07-1207-TUC-RCC, 2009 WL 465028, at *1 (D.Ariz. Feb. 24, 2009). The court presumably based this finding on testimony that the computer specialist who conducted the forensic examination had a specially-equipped laptop. However, the specialist testified that using his laptop at the border station, rather than transporting Cotterman’s electronic devices to the Tucson computer center, would have taken “a lot longer” because the laptop was "not nearly as extensive as what I have in my lab,” the "processor in my laptop is much slower” than the lab equipment, and "I could only do one computer at a time with the laptop.” Technical difficulties also could have slowed down an examination conducted at the border station.

. In 1985, the Supreme Court wrote about the government's "plenary authority to conduct routine searches and seizures at the border.” Montoya de Hernandez, 473 U.S. at 537, 105 S.Ct. 3304 (emphasis added); see also id. at 541 n. 4, 105 S.Ct. 3304 ("Because the issues are not presented today we suggest no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body-cavity, or involuntary x-ray searches.”) (emphasis added). We unfortunately seized on the word "routine” to establish a sliding scale of intrusiveness, with more intrusive (i.e., less "routine”) searches requiring reasonable suspicion. See, e.g., United States v. Molina-Tarazon, 279 F.3d 709, 711-13 (9th Cir.2002). Flores-Montano plainly repudiated that approach.

. I agree with Judge Smith that the majority’s opinion appears to create an imprudent split with the Fourth Circuit. See Dissent at 982.

. The element of choice is crucial. The fact that border searches occur at fixed times and checkpoints makes them inherently less intrusive; a person “with advance notice of the location of a permanent checkpoint has an opportunity to avoid the search entirely, or at least to prepare for, and limit, the intrusion on her privacy.’’ Mich. Dep’t of State Police v. Sitz, 496 U.S. 444, 463, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (Stevens, J., dissenting); see also Montoya de Hernandez, 473 U.S. at 544, 105 S.Ct. 3304 ("Respondent’s detention was long, uncomfortable, indeed, humiliating; but both its length and its discomfort resulted solely from the method by which she chose to smuggle illicit drugs into this country.").
The element of choice goes to the more fundamental issue of whether someone can have any reasonable expectation of privacy when he or she voluntarily carries electronic equipment across the border. Border officers are permitted to examine a written diary, and someone who wants to keep the contents of a diary secret should know not to take it across the border. The same should be true for personal data stored on a laptop or other electronic device rather than a written diary.
Moreover, the fact that the Fourth Amendment does not apply in foreign countries further weakens any claim to a reasonable expectation of privacy in property that crosses the United States border. Carrying an elec *978 tronic device outside the United States almost always entails carrying it into another country, making it subject to search under that country's laws. Travelers expect these intrusions, or at least their possibility.

. See Darrin J. Behr, Anti-Forensics: What it Does and Why You Need to Know, 255 NJ. Law. 9, 10 (Dec. 2008) (“Due to the fact that there are hundreds of digital forensic investigation procedures developed all over the world, digital forensics has yet to be defined.”).

. I note that a case currently pending in the Sixth Circuit appears to raise similar issues as this case. See United States v. Stewart, No. 12-1427 (6th Cir. filed Apr. 5, 2012); see also United States v. Stewart, 715 F.Supp.2d 750 (E.D.Mich.2010).

.Testimony from the suppression hearing in this case suggests that remote and/or intensive searches of electronic devices crossing the border do not occur all that often. For example, the computer specialist who conducted the forensic search of Cotterman’s laptop testified that the search was the first one he was asked to conduct in his 18 months on the job at the Tucson computer center. (He added that at his previous post at San Francisco International Airport, forensic searches were done right at the airport.) Similarly, one of the border agents testified that this was the first case he was aware of in which electronic devices were turned over to Immigrations and Customs Enforcement for forensic examination, and that even cursory reviews of laptops for information about illegal drug trading occurred “no more than five” times *979 during agent's three-plus years at the Luke-ville border station. See Michael Chertoff, Secretary of Homeland Security, Searches Are Legal, Essential, USA Today, July 16, 2008 ("Of the approximately 400 million travelers who entered the country last year, only a tiny percentage were referred to secondary baggage inspection for a more thorough examination. Of those, only a fraction had electronic devices that may have been checked.”).

. See also U.S. Customs & Border Protection, Directive No. 3340-049, Border Search of Electronic Devices Containing Information, 3-9 (2009) (describing procedures for, and limits on, border searches of electronic devices).

. The majority insists that reasonable suspicion is a "modest, workable standard” that is applied in domestic stops of automobiles "and other contexts,” and that still allows "agents to draw on their expertise and experience.” Majority at 967, 967 n. 14. The majority is wrong for at least three reasons. First, in making this argument, the majority reveals that it does not appreciate the crucial differences between domestic and border searches, despite those differences being spelled out in a century of case law. Those differences range from the legitimate expectation of privacy that people have in their property to the constraints government officials face in searching it. Second, a reasonable suspicion standard injects unnecessary judicial review where previously it was absent. Third, just because border agents could apply the reasonable suspicion standard does not mean they are, or should be, constitutionally compelled to do so. See Ickes, 393 F.3d at 507; cf. Seljan, 547 F.3d at 1011 (Callahan, J. concurring) (explaining that requiring border agents to apply a First Amendment exception to border searches "would require them to engage in the sort of decision-making process that the Supreme Court wished to avoid in sanctioning expansive border searches”).